Joe HUNT, Plaintiff–Appellee,

v.

CENTRAL INTELLIGENCE AGENCY,
Defendant–Appellant.

No. 92–16548.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1992.

Decided Dec. 30, 1992.

Mark B. Stern, U.S. Dept. of Justice, Washington, DC, for defendant-appellant.

James R. Wheaton, Oakland, CA, for plaintiff-appellee.

Before: GOODWIN, D.W. NELSON, and REINHARDT, Circuit Judges.

GOODWIN, Circuit Judge:

Joe Hunt filed a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1988), for disclosure of Central Intelligence Agency ("CIA" or "Agency") records regarding Hedayat Eslaminia ("Eslaminia"). The central issue is whether the CIA can refuse to confirm or deny the existence of records pertaining to a foreign national based on 5 U.S.C. § 552(b)(1) ("Exemption 1") or 5 U.S.C. § 552(b)(3) ("Exemption 3"). The district court found against the CIA and, for the reasons stated below, we reverse.

Hunt is on trial in California state court for the murder of one Eslaminia, an Iranian national. Hunt filed a request with the CIA, pursuant to FOIA, for the following information:

(1) Records reflecting the nature and extent of Eslaminia's relationship with agents or employees of the State Department or the CIA.

(2) Records which relate to meetings in West Germany, France, and Turkey at which agents of the United States government and Eslaminia were present.

(3) Records which refer to activities in which Eslaminia was involved or played a role. Specifically, records dealing with Eslaminia's:

(a) interaction with the staff of the United States Embassy and/or State Department prior to November 1, 1979;

(b) activities in Iran prior to 1979;

(c) efforts to effect a change in government in Iran after Khomeini came to power in 1979;

(d) involvement in drug-dealing and/or blackmail;

(e) attempted assistance of the United States;

(f) involvement in the various political associations formed by expatriate Iranians to oppose the regime of Khomeini;

(g) activities while in the United States.

(4) Copies of all correspondence with Eslaminia and transcripts, tapes, or reports of any meetings with him.

The CIA denied the request and, based on Exemptions 1 and 3, refused to confirm or deny the existence of such records. Hunt amended his request by deleting its first paragraph and sought administrative appeal. The CIA Information Review Committee upheld the CIA's decision.

Hunt sought review in the district court. After the court granted partial relief, the CIA filed an emergency motion for a stay in this court. We granted a temporary stay, called for expedited briefs and argument, and examined the affidavits filed by the Agency.

The district court found that the affidavits filed by the CIA in support of its claimed FOIA exemptions failed to articu-

**1118**

late a specific harm stemming from disclosure. The court also held that under the Central Intelligence Agency Information Act ("CIA Information Act"), 50 U.S.C. § 431, the CIA can refuse to confirm or deny the existence of records only when the information would relate to covert actions. The district court then held that, because no covert action was involved, the plaintiff's request should be granted in part. The court ordered the CIA to disclose whether the CIA possesses documents responsive to the FOIA request, and ordered the CIA to deliver to the court for in camera inspection a *"Vaughn* index" of documents which the agency wishes to withhold from public disclosure. *See Vaughn v. Rosen,* 484 F.2d 820, 826–28 (D.C.Cir.1973) (ordering government agency to submit index itemizing particular FOIA exemptions claimed for each requested document), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

### "THE GLOMAR RESPONSE"

■ The CIA's refusal to confirm or deny the existence of records is known as a "Glomar response." *See Phillippi v. CIA,* 546 F.2d 1009, 1011 (1976) (upholding CIA refusal to confirm or deny existence of records of CIA connection to activities of ship named the *Hughes Glomar Explorer*). The Agency's right to make a Glomar response in this case depends upon whether its affidavits support exemption from FOIA under either Exemption 1 or Exemption 3, and whether the CIA Information Act precludes the use of such a response except regarding covert activities.

### I. Sufficiency of CIA Affidavits

The CIA claims that Exemptions 1 and 3 support its refusal to reveal the existence or non-existence of documents pertaining to Eslaminia. It submitted several public and *in camera* declarations in support of its claim.

Exemption 1 covers information which an agency has classified as "secret in the interest of national defense or foreign policy" under criteria established by an Executive Order. 5 U.S.C. § 552(b)(1).

Executive Order No. 12356 provides for classification if the unauthorized disclosure of such information "either by itself or in the context of other information, reasonably could be expected to cause damage to the national security." Exec. Order No. 12356, 3 C.F.R. 166, 169 (1982). The Order specifically requires an agency to "refuse to confirm or deny the existence or non-existence of requested information whenever the fact of its existence or non-existence is itself classifiable under this Order." *Id.* at 174.

■ The CIA contends that the existence or non-existence of documents responsive to appellee's request is exempt from disclosure pursuant to Executive Order 12356, on the grounds that disclosure would compromise CIA intelligence sources and methods. We need not decide in this case whether exposure of the Agency's "sources and methods" equals "damage to the national security" under Exemption 1. Exemption 3 provides sufficient grounds to hold in favor of the Agency. *See CIA v. Sims,* 471 U.S. 159, 166–77, 105 S.Ct. 1881, 1886–92, 85 L.Ed.2d 173 (1985).

Exemption 3 covers matters which are "specifically exempted from disclosure by statute" provided that such statute affords the agency no discretion on disclosure, establishes particular criteria for withholding the information, or refers to the particular types of material to be withheld. 5 U.S.C. § 552(b)(3). The National Security Act provides that the Director of the CIA is "responsible for protecting intelligence sources and methods from disclosure." 50 U.S.C. § 403(d)(3). Section 403 qualifies as a statutory exemption to disclosure under Exemption 3. *Sims,* 471 U.S. at 167, 105 S.Ct. at 1886.

The central premise underlying the CIA's claimed FOIA exemption is that disclosure of the existence or non-existence of records pertaining to Eslaminia would compromise CIA intelligence sources and methods. In *Sims,* the Supreme Court clarified the broad scope of the CIA's exemption from disclosure of sources and methods under Exemption 3. In holding that the CIA

could refuse to disclose the names of scientists who had participated in research on "brainwashing," the Court emphasized the breadth of Exemption 3:

> Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure. The Court of Appeals' narrowing of this authority not only contravenes the express intention of Congress, but also overlooks the practical necessities of modern intelligence gathering—the very reason Congress entrusted this Agency with sweeping power to protect its "intelligence sources and methods."

> . . . .

> Disclosure of the subject matter of the Agency's research efforts and inquiries may compromise the Agency's ability to gather intelligence as much as disclosure of the identities of intelligence sources.

471 U.S. at 168–69 & 176, 105 S.Ct. at 1887 & 1891. The Court noted that the CIA could even refuse to disclose the fact that it subscribes to a publicly available Eastern European technical journal. *Id.* at 177, 105 S.Ct. at 1892.

■■■ In evaluating the CIA's claim for exemption in the present case, the district court was required to accord "substantial weight" to the CIA's affidavits. *Miller v. Casey*, 730 F.2d 773, 776 & 778 (D.C.Cir. 1984). The CIA affidavits must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of CIA bad faith. *Id.* at 776; *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C.Cir.1982) (deferential review of agency decision that release of information could disclose sources or methods of foreign intelligence).

We examined the affidavits *in camera*. They describe the scope of CIA record-keeping on foreign nationals. The CIA possesses records on foreign nationals who are CIA intelligence sources, or who are suspected foreign intelligence operatives, or, who are CIA intelligence targets. To confirm or deny the existence of records on Eslaminia could therefore reveal intelligence sources or targets.

The CIA affidavits stress that the disclosure of the existence or non-existence of documents must not be viewed in isolation but rather as one tile in a mosaic of intelligence gathering. Through the CIA's disclosure of the existence or non-existence of records on particular individuals, a FOIA requester could make the information public or otherwise available to counter-intelligence operations from other nations. The CIA suggests that those experts could then determine the contours and gaps of CIA intelligence operations and make informed judgments as to the identities of probable sources and targets in other countries.

According to CIA affidavits, barring a Glomar response, CIA intelligence gathering would be impaired by its own disclosures in response to FOIA requests. CIA sources could find themselves under suspicion and in grave danger. The CIA avers that potential future sources would be reluctant to come forward; targets of intelligence scrutiny would be alerted and could take additional precautions; and foreign operatives could learn whether or not CIA was aware of their activities.

The CIA affidavits explain that disclosure of the existence or non-existence of records pertaining to Eslaminia is tantamount to a disclosure whether or not he was a CIA source or intelligence target. The affidavits then explain, with as much particularity as in *Gardels* and *Miller*, why disclosure of this information would have a negative impact on CIA intelligence gathering.

In *Gardels*, the CIA was allowed to issue a Glomar response to a request for information regarding covert CIA contacts at campuses of the University of California. 689 F.2d at 1103. The CIA affidavit explained that disclosure of the existence of such records would trigger the danger that foreign intelligence agencies could discover who those covert contacts were, and could determine which research areas interested the CIA. *Id.* at 1104. The affidavits do

**1120**

not mention harms to particular individuals. Similarly, in *Miller*, the court allowed a Glomar response to a request for information as to U.S. attempts to infiltrate agents into Albania during the period of 1945–1953. 730 F.2d at 778. The CIA affidavit identified three possible ways that acknowledging the existence of documents could jeopardize the confidentiality of CIA sources or methods under Exemption 3: it could allow Albanian leaders to identify participants in the covert action, damage future CIA efforts to recruit sources, and reveal how the CIA deployed its forces.

■ In each of these cases, as in the present case, the court upheld the Glomar response because the affidavits were as specific as possible given the nature of the information the CIA sought to protect. In *Gardels*, the CIA was not required to identify the particular individuals at the University of California who would be affected by disclosure of CIA records. Similarly, in the case at hand, the CIA affidavits need not identify the particular individuals who would be affected by the disclosure of the existence of CIA records on particular foreign nationals.

■ In support of its ruling, the district court observed that disclosure of the existence of CIA records would not indicate the extent of CIA interest in an individual. However, the extent of the CIA interest in a foreign national is not relevant. According to the CIA, any such interest, if made public, may create the danger that sources and methods of intelligence gathering will be compromised. The CIA asserts that it is the identity of individuals as sources or targets that can be matched up with information possessed by foreign intelligence operatives about overseas contacts, addresses, telephone numbers, and other information that may form pieces of a puzzle. In *Sims*, the extent of CIA interest in an East European journal that was available in public libraries was not important. The CIA considered it important that foreign intelligence operatives not be told which magazines the CIA wanted to read. The CIA's central concern here is that disclosure would reveal CIA sources and methods; there is no requirement under *Sims* that the revelation cause a high degree of damage to CIA intelligence gathering.

According to CIA affidavits, it is also irrelevant that some of the information sought by Hunt had already been made public by other governmental and law enforcement agencies. If, indeed, other agencies have made public information that the CIA is, or may be interested in a person, it becomes important that the CIA not be compelled to confirm or deny such reports.

"Congress intended to give the Director of Central Intelligence broad power to protect the secrecy and integrity of the intelligence process." *Sims*, 471 U.S. at 170, 105 S.Ct. at 1888. Here, the CIA's affidavits explain the Agency's conclusion that a Glomar response is required to protect intelligence sources and methods. In light of the Director's extensive power to protect these sources and methods, we conclude that Hunt's request is exempt from FOIA. The district court should have denied the request.

■ We agree with the district court that, with this decision, we are now "only a short step [from] exempting all CIA records" from FOIA. That result may well be contrary to what Congress intended. A congressional report issued only one year before *Sims* states that FOIA "has played a vital part in maintaining the American people's faith in their government, and particularly in agencies like the CIA." H.Rep. No. 726, 98th Cong., 2d Sess. 9 (1984), U.S. Code Cong. & Admin. News 1984, 3741, 3747. Whether or not that was actually the case at one time, it certainly is not true now, at least insofar as the CIA is concerned. Nevertheless, nothing in statute or case precedent permits us to reach a different result than *Sims* and the other cases command.

If Congress did not intend to give the CIA a near-blanket FOIA exemption, it can take notice of the courts' incremental creation of one, and take the necessary legislative action to rectify the matter.

## II. Central Intelligence Agency Information Act

As an alternative ground for its holding, the district court found that the CIA Information Act, 50 U.S.C. § 431, precludes the CIA from using a Glomar response unless the FOIA request relates to covert action. We disagree.

Congress recognized that CIA operational files rarely contain documents disclosable under FOIA, and that FOIA search and review requirements created a risk of "accidental or unintended disclosure of sensitive material from operational files in the FOIA process." H.R.Rep. No. 726, 98th Cong., 2d Sess. pt. 1, 10 (1984), U.S. Code Cong. & Admin. News 1984, 3748. The CIA Information Act provided a blanket exemption from FOIA requirements for most CIA operational files in order "to relieve the Central Intelligence Agency from an unproductive Freedom of Information Act (FOIA) requirement to search and review certain CIA operational files." *Id.* at 4, U.S. Code Cong. & Admin. News 1984, 3742.

Congress provided, however, that exempted operational files shall continue to be subject to search and review for information concerning "any special activity the existence of which is not exempt from disclosure under the [Freedom of Information Act]." 50 U.S.C. § 431(c)(2). The legislative history clarified that, so long as the existence of a special activity, or covert action, remains classified, the CIA has the ability to refuse to confirm or deny the existence of records on that subject. *See* H.R.Rep. No. 726, 98th Cong., 2d Sess. pt. 1, 27 (1984), U.S. Code Cong. & Admin. News 1984, 3765 (with regard to records concerning a "special activity," CIA Information Act does not intend "in any way to limit the ability of the CIA to utilize this so-called 'Glomar' response").

The legislative history relied upon by the district court does not stand for the proposition that a Glomar response is appropriate only in response to a FOIA request for records concerning covert action. The legislative history merely clarified that, despite the exclusion of information regarding covert actions from the blanket exemption granted to operational files, the CIA could still refuse to confirm or deny the existence of such documents when appropriate. Congress showed no intention to limit the CIA's ability to use a Glomar response in other situations.

The CIA Information Act is irrelevant to this court's determination whether the CIA can refuse to confirm or deny the existence of records pertaining to Eslaminia.

The judgment of the district court is REVERSED.