UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 92-2234

SHERRY ANN SULLIVAN,

Plaintiff, Appellant,

v.

CENTRAL INTELLIGENCE AGENCY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Breyer, Chief Judge,

Selya and Stahl, Circuit Judges.

James H. Lesar, with whom David L. Sobel and Mark Zaid were

on brief, for appellant.
Robert M. Loeb, Attorney, Appellate Staff, Civil Division,

U.S. Department of Justice, with whom Stuart M. Gerson, Assistant

Attorney General, Richard S. Cohen, United States Attorney, and

Leonard Schaitman, Attorney, Civil Division, were on brief, for

appellee.

May 26, 1993

SELYA, Circuit Judge. Invoking the Freedom of
SELYA, Circuit Judge.

Information Act (FOIA), 5 U.S.C. 552 (1988), plaintiff-

appellant Sherry Ann Sullivan requested information from nine

federal agencies. Her curiosity unslaked by the meager responses

to her request, she sued. The federal district court ordered the

agencies to explain their search methodologies in greater detail

and reviewed some withheld documents in camera. Finding no FOIA

violations, the court granted summary judgment in favor of all

defendants.

Ms. Sullivan appeals with respect only to the Central

Intelligence Agency (CIA).1 She limits her argument to the

adequacy of the CIA's file search and the applicability of the

President John F. Kennedy Assassination Records Collection Act of

1992 (JFK Act), Pub. L. No. 102-526, 106 Stat. 3443 (1992).

After "indulging all reasonable inferences in [appellant's]

favor," Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990),

as the summary judgment standard necessitates, we affirm.

I. A POSSIBLE MISSION

Appellant's father, Geoffrey Sullivan, and his quondam

colleague, Alexander Rorke, were last seen on September 24, 1963,

leaving Cozemel, Mexico in a twin-engine Beechcraft airplane.

Though the pair filed a flight plan for Tegucigalpa, Honduras,

they never arrived. A search ensued, but neither the aircraft

nor its occupants were found.

1In view of this limitation, we omit any reference to the
other eight agencies in the pages that follow.

2

In later years, appellant grew determined to solve the

mystery of her father's disappearance. On the basis of

interviews and an inspection of declassified government

documents, appellant surmised that Rorke and her father were

engaged in a CIA-sponsored mission to drop propaganda (or perhaps

something more sinister) over Cuba. Despite appellant's

suspicions, the CIA steadfastly refused to acknowledge that it

employed either man at any time.

Undaunted, appellant requested that the CIA provide her

with documents about the missing men. The agency perused its

non-operational files, finding no data about Geoffrey Sullivan

and a few, apparently inconsequential, documents relating to

Rorke. When the agency balked at searching its operational

files, appellant instituted the instant action.

II. THE FOIA CLAIM

We begin by exploring the intersection between FOIA and

the CIA Information Act of 1984, 50 U.S.C. 431-432 (1988). We

then apply the statutory framework to the case at bar.

A. Statutory Structure.

In general, FOIA requires that upon due inquiry every

federal agency "shall make [requested] records promptly available

to any person." 5 U.S.C. 552(a)(3). This broad command is

hedged by nine exemptions. See 5 U.S.C. 552(b). Although

these exemptions cover much of what typically might be found in

3

CIA operational files,2 FOIA does not give the CIA carte blanche

to refrain from producing documents merely because it is an

intelligence agency. Consequently, the CIA had to divert trained

intelligence officers to search its entire file system in

response to FOIA requests, notwithstanding the relatively limited

number of non-exempt documents likely to be culled. See S. Rep.

No. 305, 98th Cong., 1st Sess. 6-7 (1983). To curb the

inefficiencies inherent in applying standard FOIA requirements to

the arcane realm of the CIA, Congress, acting pursuant to its

reserved power to insert additional FOIA exemptions in other

statutory enactments, see 5 U.S.C. 552(b)(3); see also CIA v.

Sims, 471 U.S. 159, 167-68 (1985) (acknowledging that the CIA

Information Act creates FOIA exemptions); Maynard v. CIA, 986

F.2d 547, 555 (1st Cir. 1993) (similar), passed the CIA

Information Act.

The Information Act addressed the problem by excusing

the CIA from searching its operational files in response to most

FOIA requests. Operational files, i.e., files that memorialize

the conduct and means of the government's foreign intelligence

and counterintelligence efforts, see 50 U.S.C. 431(b), are the

most sensitive of the CIA's records and, thus, the most likely to

need an extra measure of protection. Recognizing, however, that

operational files can be highly informative, Congress carefully

2For example, FOIA does not require production of classified
national defense and foreign policy documents, 5 U.S.C.
552(b)(1), trade secrets or other confidential commercial
information, 5 U.S.C. 552(b)(4), or law enforcement
investigatory files, 5 U.S.C. 552(b)(7).

4

carved out three areas in which requestors, notwithstanding the

statutory bar, might nonetheless receive materials.

Specifically, the CIA must search such files and produce relevant

information if a document request is

(1) [from] United States citizens . . .
who have requested information on themselves
. . . ; [or]

(2) [regarding] any special activity the
existence of which is not exempt from
disclosure under [FOIA]; [or]

(3) the specific subject matter of an
investigation by the intelligence committees
of the Congress, the Intelligence Oversight
Board, the Department of Justice, the Office
of General Counsel of the [CIA], the Office
of Inspector General of the [CIA], or the
Office of the Director of Central
Intelligence for any impropriety, or
violation of law, Executive order, or
Presidential directive, in the conduct of any
intelligence activity.

50 U.S.C. 431(c). In sum, then, the statutory exceptions are

for first-party requests, special activity requests, and requests

that focus on investigations of improprieties in intelligence-

gathering activities.

B. Applying the Exceptions.

Although appellant asserts that her information request

implicates each of the three exceptions quoted above, we think

none of them apply in this case. We explain briefly.

1. First-Party Requests. Restricting this aspect of
1. First-Party Requests.

her appeal to the information she solicits about her father, Ms.

Sullivan asseverates that the CIA must search its operational

files for responsive documents because section 431(c)(1),

5

properly interpreted, requires the agency, on request, to produce

information about the requestor's next-of-kin. We disagree.

Appellant arrives at her rather curious reading of the

statute by a two-step pavane. She says, first, that the statute

is vague as to rights of next-of-kin; and second, that the

legislative history resolves the uncertainty in her favor. We

find neither step to be consistent with the rhythm of the

Information Act.

Section 431(c)(1) is anything but murky. The statute's

language limits the exclusion to "United States citizens . . .

who have requested information on themselves." 50 U.S.C.

431(c)(1). While appellant suggests that, in context, the word

"themselves" is ambiguous, we are confident that the word's

common meaning "those identical ones that are they," Webster's

Third New International Dictionary 2370 (1986) is not only

palpably plain but is also anathematic to appellant's rendition

of the exception. The lack of ambiguity entirely undermines Ms.

Sullivan's position. Courts will only look behind statutory

language in the rare case where a literal reading must be shunned

because it would produce an absurd outcome, see, e.g., Public

Citizen v. United States Dep't of Justice, 109 S. Ct. 2558, 2566

(1989) ("Where the literal reading of a statutory term would

compel an odd result, [courts] must search for other evidence of

congressional intent . . . .") (citation and internal quotation

marks omitted), or when the legislature has otherwise blown an

uncertain trumpet. See Morales v. Trans World Airlines, Inc.,

6

112 S. Ct. 2031, 2036 (1992); FMC Corp. v. Holliday, 111 S. Ct.

403, 407 (1990); see also United States v. Aversa, 984 F.2d 493,

499 n.8 (1st Cir. 1993) (en banc) (reiterating that where statute

is clear, further hermeneutics are unnecessary) (collecting

cases). Here, reading the statute literally produces a perfectly

plausible result and the clarity of the statutory command is

stunning. That ends the matter: if Congress had wished to

create a right for next-of-kin, it could and, we think, would

have done so explicitly.

The second step of appellant's section 431(c)(1) pavane

is equally bollixed. The legislative history of the Information

Act reinforces rather than weakens the unrelievedly narrow

construction of the first-party exception that the statutory

language portends. See, e.g., S. Rep. No. 305, at 17-18. While

some members of Congress apparently believed that the CIA would

treat next-of-kin requests "generously," id. at 18, such

generosity was obviously meant to be a matter of grace. The

Senate Report states unequivocally: "This legislation does not

give next-of-kin a right to request information about a deceased

person." Id. at 17. The predictions of individual senators to

the effect that an agency, once empowered, will act with greater

generosity than it is obliged to exhibit cannot serve to

overwhelm the letter of the law.

We have said enough. Neither the text of section

431(c)(1) nor its legislative history support a right of access

to CIA operational files for next-of-kin requestors. Hence,

7

appellant cannot wield the first-party exception as a wedge to

loosen the restrictions that safeguard CIA operational files.

2. Special Activity Requests. Appellant's next claim
2. Special Activity Requests.

is that the CIA must produce the information she seeks because

her request relates to a "special activity" within the purview of

50 U.S.C. 431(c)(2). In this instance, the statute's language

provides relatively scant guidance, other than to mandate that,

in addition to having a special activity linkage, the material

must not otherwise be exempt from disclosure under FOIA. See id.

The statute is silent in a critical respect; neither its text nor

its structure afford a meaningful insight into what

characteristics of a CIA activity make it "special." We turn,

therefore, to the legislative history. See, e.g., Greenwood

Trust Co. v. Massachusetts, 971 F.2d 818, 824 (1st Cir. 1992)

(discussing preferred approaches to statutory construction where

a statute's text leaves unanswered questions), cert. denied, 113

S. Ct. 974 (1993).

House and Senate reports make clear that Congress

designed the special activity exception to allow public access to

declassified information while still permitting the CIA to refuse

to confirm or deny the existence of documents relating to

classified covert operations. See H.R. Rep. No. 726, 98th Cong.,

2d Sess. 27 (1984); S. Rep. No. 305, at 24. To accommodate these

competing objectives, the special activity provision must be

construed in light of two basic concerns: specificity and

secrecy.

8

As to the specificity prong, a requestor must identify

a particular CIA activity in connection with his or her request.

The House report accompanying the Information Act tells us that

the term "special activity"

means any activity of the United States
Government, other than an activity intended
solely for obtaining necessary intelligence,
which is planned and executed so that the
role of the United States is not apparent or
acknowledged publicly, and functions in
support of any such activity, but not
including diplomatic activities.

H.R. Rep. No. 726, at 28. The Senate added content to this

explanation by furnishing examples. Thus, requests must relate

to "a specific covert action operation, such as the Bay of Pigs

invasion or the CIA's role in replacement of the Guatemala regime

in the 1950s . . . ." S. Rep. No. 305, at 24-25. By contrast, a

request is insufficiently specific "if it refers to a broad

category or type of covert action operations." Id. at 25. As an

example of an inadequately particularized request, the Senate

report mentions one that is "predicated on declassification of

the existence of CIA covert efforts to counter Soviet influence

in Western Europe during the 1950s . . . ." Id.

Appellant argues on appeal that the information she

seeks is part and parcel of a particular "special activity": the

CIA's unremitting efforts to overthrow Cuban President Fidel

Castro. Although the parties dispute whether appellant espoused

this theory before the district court, we need not resolve the

question of waiver because it is apparent that, even in its

present incarnation, appellant's theory is unavailing: it rests

9

on CIA activity that is too expansively described to slip within

the integument of section 431(c)(2).

In an effort to prove the contrary, appellant seizes on

an example limned in the Senate report and proclaims that the

coup deposing Guatemalan President Arbenz in 1954 is a fair

congener to the special activity she has described. We think

not. While equating the two might produce a certain superficial

symmetry, doing so flies in the teeth of history. There is an

essential difference in the magnitude and scope of the anti-

Arbenz and anti-Castro campaigns. President Arbenz fled his

country at the conclusion of a CIA-inspired operation that lasted

only a few months and involved only a handful of agents. See

Jeremiah O'Leary, Tricks of the Coup Trade, Wash. Times, Dec. 19,

1989, at F3; see generally Julius Pratt, A History of United

States Foreign Policy 532-33 (1965). Like the Bay of Pigs, the

overthrow of the Guatemalan government was a discrete operation

with a beginning, an end, and a circumscribed middle. In

contrast, the CIA's campaign against Castro has been ongoing for

decades. By all accounts, it has involved widespread efforts and

hordes of people. Indeed, the CIA's role in respect to Castro's

Cuba is more properly analogous to CIA operations against Soviet

influence in Western Europe during the 1950s, a course of conduct

which the Senate specifically indicated was too sweeping to

trigger the special activity exception, than to the coup in

Guatemala.

We turn now to the second prong: secrecy. The special

10

activity provision also requires that the requested material not

be exempt from disclosure under FOIA. At the very least, this

means that the data must be either unclassified or declassified.

See 5 U.S.C. 552(b)(1)(B) (establishing FOIA exemption for

classified materials). Declassification occurs only when "an

authorized Executive Branch official has officially and publicly

acknowledged the existence . . . of a specific special activity."

S. Rep. No. 305, at 24; see also Hunt v. CIA, 981 F.2d 1116, 1121

(9th Cir. 1992) (recognizing that the CIA need not release any

information on special activities that remain classified).

Appellant's request fails this prong of the section 431(c)(2)

test because the activity about which she inquires is not

generally declassified. The mere fact that the CIA acknowledges

involvement in an incident or, more broadly, in a particular

region of the world, does not justify the release of documents

which touch, however distantly, on that incident or region.

Of course, certain aspects of the CIA's efforts to

destabilize the Castro regime are in the public domain (the Bay

of Pigs, for one). Nonetheless appellant's initial FOIA request

apparently did not seek information related to the subjects'

participation in any specific (declassified) operations,3 but

simply inquired about the two men whose alleged role in CIA

affairs has never been acknowledged by either the CIA or any

3We are frank to acknowledge that the appellate record is
not entirely pellucid in this regard. Appellant, however, must
bear the onus of such shortcomings in the record. See

Massachusetts v. Secretary of Agric., 984 F.2d 514, 523 n.7 (1st

Cir. 1993).

11

Executive Branch official and the circumstances of their

disappearance. In this case, such a level of generality is

necessarily fatal. With respect to CIA operations, "it is one

thing . . . to speculate or guess that a thing may be so . . . ;

it is quite another thing for one in a position to know of it

officially to say that it is so." Fitzgibbon v. CIA, 911 F.2d

755, 765 (D.C. Cir. 1990) (quoting Alfred A. Knopf, Inc. v.

Colby, 509 F.2d 1362, 1370 (4th Cir.), cert. denied, 421 U.S. 992

(1975)). That some operations against Cuba have been

declassified is insufficient to throw open all CIA files

regarding Cuba.

At bottom, the interleaved fact that appellant did not

initially identify (i) a particular operation against the Castro

regime that (ii) is declassified and in which she believed her

father participated, defeats her effort to invoke section

431(c)(2).

3. Investigatory Requests. Finally, appellant hawks
3. Investigatory Requests.

the notion that because a Senate Select Committee (the Church

Committee) inquired into certain covert operations against Cuba

mounted by the CIA and other (putatively independent) anti-Castro

groups,4 the information she requests comprises "the specific

subject matter of an investigation by [an] intelligence

committee[] of the Congress . . . for any impropriety, or

4The Church Committee eventually filed a compendious report
of its investigation. See The Investigation of the Assassination

of President John F. Kennedy: Performance of the Intelligence

Agencies, S. Rep. No. 755, 94th Cong., 2d Sess. (1976).

12

violation of law . . . in the conduct of an intelligence

activity." 50 U.S.C. 431(c)(3). In our view, appellant's FOIA

request does not fall within the exception's province.

As the statute's language and legislative history make

clear, see id.; see also H.R. Rep. No. 726, at 28-31, a

congressional investigation that touches on CIA conduct in a

particular incident or region, standing alone, is not sufficient

to warrant the release of all CIA documents anent that incident

or region. Instead, the congressional investigation and the

documents sought must specifically relate to CIA wrongdoing, that

is, some "impropriety" or "violation of law" in the conduct of

the designated intelligence activity. 50 U.S.C. 431(c)(3).

The primary mission of the Church Committee, as appellant admits,

was to examine the relationship, if any, between the

assassination of President Kennedy, on the one hand, and

American-sponsored operations against Cuba, on the second hand.

In the course of its work, the Committee considered American

operations against Castro and, inevitably, their legality. Seen

from that perspective, the Committee's mission does not fit

within the contours of section 431(c)(3) for two reasons. First,

the Committee's inquiry was not a direct investigation into CIA

wrongdoing. Second, appellant's request for information about

her father's disappearance bears no claimed or readily

discernible relationship to the investigation's purposes. This

latter obstacle is insurmountable: a pivotal requirement of

section 431(c)(3) is that, to be extractable, the information

13

requested must concern the specific subject matter of the

official investigation. Thus, although there were instances in

which the Committee searched for agency misconduct, that

happenstance does not allow appellant to catapult herself over

the statutory parapet. It is simply not enough that information

which bore in some remote way on the request surfaced in the

course of an official investigation. See H.R. Rep. No. 726, at

30-31.

Appellant also points hopefully, albeit without

developed argumentation, to the work of the House Select

Committee on Assassinations (HSCA). This committee probed

whether the CIA might have played a role in the death of

President Kennedy, see H.R. Rep. No. 1828, 95th Cong., 2d Sess.

(1979), concluding that it did not. Id. at 3. Assuming arguendo

that the HSCA investigation centered on potential CIA wrongdoing,

its work still cannot serve as a vehicle for bringing appellant's

request within the statutory exception. Appellant is not seeking

information on the CIA's role in the Kennedy assassination and

has not alleged that either her father or Rorke was directly

involved in any such machinations. Hence, because her request

does not overlap the "specific subject matter of [the]

investigation," 50 U.S.C. 431(c)(3), she cannot use the HSCA

report as a means to escape the strictures of the Information

Act.

We rule, therefore, that neither the Church Committee's

investigation nor HSCA's probe is sufficiently sturdy a bootstrap

14

to lift appellant's FOIA request over the hurdles erected by the

congressional investigation exception to the Information Act.5

III. THE JFK ACT CLAIM

After the district court entered summary judgment, but

before appellant briefed this appeal, Congress passed the JFK

Act, Pub. L. No. 102-526, 106 Stat. 3443 (1992). The Act

requires that records related to President Kennedy's

assassination be transferred to the National Archives where they

are to be made publicly available, subject to certain stipulated

conditions. Id. 5. The Act constructs a process distinct

from FOIA by which the public can search those documents in an

almost unfettered fashion. See id. 4. In a peroration that

sheds considerably more heat than light, appellant insinuates

that her father's disappearance might be tied in some undefined

way to President Kennedy's assassination and implores that we

order the district court to review her information request under

the new law's disclosure provisions. Her argument is policy-

driven; in her view, federal courts should go to great lengths to

order documents produced under the JFK Act because the statute

instructs agencies to "give priority to . . . the identification,

review, and transmission, under the standards of postponement set

forth in this Act, of assassination records that on the date of

enactment of this Act are the subject of litigation under

5Having disposed of appellant's initiative on this ground,
we need not consider whether either the Church Committee or HSCA
was an "intelligence committee[]" within the meaning of section
431(c)(3).

15

[FOIA]." See id. 5(c)(2)(G).

We are unconvinced. The JFK Act, like FOIA, assigns

primary responsibility for assessing information requests to the

Executive Branch. Judicial review is merely a safeguard against

agency action that proves arbitrary, capricious, or contrary to

law, not an option of first resort. We can discern no valid

reason to throw caution to the winds, disrupt the orderly

workings of the statutory scheme, and instruct the district court

to dive headlong into uncharted waters. Doing so would be

premature from virtually every standpoint: the compilation of

records required by the JFK Act has not been completed, appellant

has not invoked the administrative processes afforded under the

legislation, no agency action has been taken thereunder, and, a

fortiori, there is no administrative record for a court to mull.

See Assassination Archives & Research Ctr. v. U.S. Dep't of

Justice, F. Supp. , n.3 (D.D.C. 1993) [No. 92-2193;

slip op. at 12 n.3] (finding similar JFK Act claim unripe).

We need go no further. Appellant has boldly grafted a

neoteric JFK Act claim that belongs before the Archivist of the

United States onto her FOIA appeal. Since there is no agency

action for the district court to review, we decline to

participate in so radical an experiment. See JFK Act, 11(c)

(providing for judicial review of "final actions" taken by

agencies).

IV. CONCLUSION

Although we sympathize with appellant's desire to learn

16

the details of her father's fate, she, like all other litigants,

must abide by the rules. Congress crafted the CIA Information

Act to strike a balance between public disclosure and an

effective intelligence apparatus. Our role is not to reassess

the relative interests, see Sims, 471 U.S. at 180, or to yield

whenever human sympathies are engaged, but simply to apply the

law as Congress wrote it. Given the generality of appellant's

request and the stringent standard of confidentiality contained

in the Information Act, the district court appropriately granted

summary judgment in the government's favor. Further, as we have

explained, the freshly minted JFK Act claim provides no

principled basis for a remand and, thus, no detour around the

ruling below.

Affirmed.

17