# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LARRY BERMAN,
              *Plaintiff-Appellant,*

       v.

CENTRAL INTELLIGENCE AGENCY,
              *Defendant-Appellee.*

No. 05-16820

D.C. No.
CV-04-02699-DFL

OPINION

Appeal from the United States District Court
for the Eastern District of California
David F. Levi, District Judge, Presiding

Argued and Submitted
July 10, 2007—San Francisco, California

Filed September 4, 2007

Before: David R. Thompson, Pamela Ann Rymer and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

11337

**COUNSEL**

Thomas R. Burke and Duffy Carolan (argued), Davis Wright Tremaine LLP, San Francisco, California; and Meredith Fuchs, The National Security Archive, Washington, D.C., for the plaintiff-appellant.

Peter D. Keisler, McGregor W. Scott, Mark B. Stern (argued) and Alisa B. Klein, U.S. Department of Justice, Washington, D.C., for the defendant-appellee.

Matthew W.S. Estes, Washington, D.C., for the *amici curiae* The American Historical Association, et al.

**OPINION**

FISHER, Circuit Judge:

For nearly half a century, the CIA has each day sent the President a highly classified summary of the most important and timely intelligence relating to this country's national defense and foreign policy priorities. We must decide in this case whether two of these reports — known as the President's Daily Brief (PDB) — from the administration of President Lyndon B. Johnson are exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. We hold that the CIA has provided ample justification that the disclosure of the two PDBs would reveal protected intelligence sources and methods, and thus these PDBs are protected by FOIA exemption 3 and the National Security Act (NSA), 50 U.S.C. §§ 403-1(i)(1), 403g.

I.

The practice of specialized presidential intelligence briefing dates back to the administration of President John F.

Kennedy. After taking office, President Kennedy asked the CIA to produce a special briefing that succinctly summarized recently collected intelligence information that would be of interest to the President and his senior advisors. That briefing, which was then called the President's Intelligence Checklist (PICL), became an important medium of communication between the leadership of the CIA and the White House. When President Johnson took office, the PICL's format was modified to suit his particular tastes, and was renamed the President's Daily Brief. The PDBs of that era reported on international developments based on intelligence sources that included satellite photographs, signal intercepts, individual recruits, Department of State communications, published news accounts and other publicly available information. Because the PDBs were high-level intelligence documents, they were then and still are classified documents that are available only to the President and his senior advisors.

Over the years, a handful of the more than 13,500 existing PICLs and PDBs have made their way into the public domain, either deliberately or by mistake. Ten redacted PICLs from the Kennedy administration were released pursuant to the President John F. Kennedy Assassination Records Collection Act of 1992. *See* 44 U.S.C. § 2107 note. Two more recent PDBs were released as a part of the Final Report of the National Commission on Terrorist Attacks on the United States, commonly known as the 9/11 Report. These PDBs were declassified after the Director of Central Intelligence determined that the public interest in disclosure outweighed the potential damage to national security that could result from disclosure. *See* Exec. Order No. 12,958, 68 Fed. Reg. 15315, § 3.1(b) (as amended by Exec. Order No. 13,292).

At least 15 redacted PDBs from the Johnson administration have also been released. These PDBs illustrate the format and content that was common during that period. They were produced in a two-column format with particular countries listed on the left and one or two paragraphs about recent events in

each country on the right. The content of these PDBs are generally factual, although in some cases the author provides predictions about where current events might lead. The tone is generally informal.

Larry Berman, a political science professor at the University of California, Davis, filed a FOIA request seeking two Johnson-era PDBs: from August 6, 1965 and from April 2, 1968. The CIA denied his request, asserting FOIA exemptions for classified national security information (exemption 1); for protected intelligence sources and methods (exemption 3); and for privileged communications (exemption 5). *See* 5 U.S.C. § 552(b)(1), (b)(3), (b)(5). After his administrative appeal was denied, Berman filed a declaratory judgment action in the Eastern District of California seeking disclosure.

In the district court proceedings, the CIA supported its asserted exemptions with the 39-page declaration and three-page supplemental declaration of CIA information review officer Terry Buroker. In his declarations, Buroker asserts that the PDBs "must be withheld in their entirety, as no reasonably segregable, non-exempt portions of the documents exist." Buroker provides two related factual bases for the claimed necessity of keeping the PDBs secret.

First, Buroker describes the general content and function of PDBs. He explains that during the Johnson administration, PDBs were used to synthesize, in a few pages, the most recently gathered and critical intelligence information the CIA possessed. Because of their condensed format, the Johnson PDBs contained only that information that leadership within the CIA believed would be most important to the President and his senior advisors. Buroker explains that PDBs served as a starting point for high level discussions regarding intelligence and national security between the President and the CIA. As a result, the PDBs themselves reflect one side of this ongoing dialogue. According to Buroker, the Johnson PDBs include sensitive information such as: "a) undisseminated raw

operational information, sometimes including true names of sources and/or cryptonyms, b) sensitive operational information added to the document by the Directorate of Operations after the Directorate of Intelligence has written or edited the material in the PDB, c) information restricted at the very highest levels of human and technical source intelligence gathering, d) information from covert technical operations, and e) information from specifically developed or acquired CIA-only methods."

Second, Buroker discusses why the specific PDBs requested in this case would result in harm to the CIA's intelligence gathering interests. Buroker states that the specific PDBs Berman requests "contain explicit references to information provided by foreign officials as well as other information that may incorporate information from foreign liaison relationships," including foreign governments and foreign intelligence services. The PDBs also "contain references to intelligence obtained from individual human sources and from confidential liaison relationships." Buroker warns that such information was provided "only upon a guarantee of absolute secrecy," and disclosure of the requested PDBs "would tend to reveal the identities of intelligence sources." This could lead to severe harms to the sources of the information, including "embarrassment, political ruin, retribution . . . imprisonment, torture or even death of the source or the source's family and friends." Moreover, Buroker states that disclosure of the requested PDBs "would disclose specific intelligence methods, including technical collection methods." For all of these reasons, disclosure "reasonably could be expected to cause exceptionally grave damage to the national security of the United States."

The district court granted summary judgment in favor of the CIA, holding that the CIA had made an adequate showing that the documents were shielded from disclosure by exemptions 3 and 5. *See Berman v. CIA*, 378 F. Supp. 2d 1209 (E.D. Cal. 2005). This timely appeal followed.

## II.

The district court's grant of summary judgment in a FOIA case is reviewed under a two-step test. *See Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1078 (9th Cir. 2004). First, we ask whether the district court had an adequate factual basis for its decision. We review the district court's determination that a particular set of documents (here the Buroker declarations) provided an adequate factual basis de novo. Second, we ask whether the district court's decision regarding applicability of FOIA's exemptions was correct. If the district court's determination turns mainly on findings of fact, we review for clear error. *Id.* However, where as here the district court's determination turned on its interpretation of the law, we review de novo. *See generally Schiffer v. FBI*, 78 F.3d 1405, 1409 (9th Cir. 1996) ("Although any factual conclusions that place a document within a stated exemption of FOIA are reviewed under a clearly erroneous standard, the question of whether a document fits within one of FOIA's prescribed exemptions is one of law, upon which the district court is entitled to no deference" (citation and internal quotation marks omitted)).

## III.

### A.

**[1]** FOIA exemption 3 permits government agencies to maintain the secrecy of information that is "specifically exempted from disclosure by [certain] statute[s] . . . ." *See* 5 U.S.C. § 552(b)(3). The National Security Act is such a statute. *See CIA v. Sims*, 471 U.S. 159, 167 (1985). That statute instructs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1); *see also* 50 U.S.C. § 403g.[1]

---

[1]The statute formerly referred to the Director of Central Intelligence. *See Sims*, 471 U.S. at 167. The change in titles and responsibilities has no impact on this case. *See Wolf v. CIA*, 473 F.3d 370, 377 n.6 (D.C. Cir. 2007).

**[2]** The NSA provides the Director with "very broad authority to protect all sources of intelligence information from disclosure." *Sims*, 471 U.S. at 168-69. Because of this "sweeping power," *id.* at 169, courts are required to give "great deference" to the CIA's assertion that a particular disclosure could reveal intelligence sources or methods, *id.* at 179. The term "sources" is to be broadly construed and encompasses not only "secret agents," but instead reaches all sources of information the CIA relies upon, including publicly available information. *Id.* at 170-71.

**[3]** We have acknowledged that after *Sims*, there exists "a near-blanket FOIA exemption" for CIA records. *Hunt v. CIA*, 981 F.2d 1116, 1120 (9th Cir. 1992). Indeed, *Sims* leaves courts "only a short step from exempting all CIA records from FOIA." *Id.* (internal quotation marks and alteration omitted). Concerned that this broad reading of CIA authority might be contrary to congressional intent, we have invited Congress to "take the necessary legislative action to rectify" that disparity. *Id.*; *see also Minier v. CIA*, 88 F.3d 796, 804 (9th Cir. 1996) ("Only Congress can override the plain language of [the NSA]."). Congress, however, has to date left the NSA materially unaltered and so we must continue to afford the CIA broad deference. Nonetheless, just as Congress has not reduced the CIA's authority under the NSA, neither has it expanded the CIA's protection from FOIA from a "near-blanket" exemption to a blanket exemption. We therefore continue to conduct some meaningful — albeit restrained — review of the CIA's assertions.

**[4]** The CIA bears the burden of proving the applicability of the exemption. *Minier*, 88 F.3d at 800. Although the CIA's reasons are entitled to deference, the CIA's declarations must still "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of CIA bad faith." *Hunt*, 981 F.2d

at 1119. The CIA must do more than show simply that it has acted in good faith. *See Wiener v. FBI*, 943 F.2d 972, 983 n.19 (9th Cir. 1991).

### B.

Buroker asserts that exemption 3 applies because the PDBs could "expose the existence of specific intelligence sources and methods."[2] He explains that each of the requested PDBs contains "information specifically stating sensitive sources or methods of collection" and would reveal "substantial information about its provenance to an educated reader." Buroker adds that "each edition of the PDB is a piece of a 'mosaic' of information reflecting the most sensitive, as well as the mundane, intelligence sources and methods employed by the CIA and the Intelligence Community over time."

In *Wiener*, we held that a CIA affidavit was inadequate to support the CIA's invocation of exemption 3 because it "fail-[ed] to discuss the facts or reasoning upon which [the declarant] based his conclusion." *Wiener*, 943 F.2d at 983. This was problematic because it denied the plaintiff the opportunity to contest the CIA's conclusions, and thus distorted the adversary process. *See id.* The CIA affidavit we rejected stated without justification that "disclosure of [the withheld] portions reasonably could be expected to lead to identification of the source of the information." *Id.* (alteration in original, internal quotation marks omitted).

[5] Unlike the affidavit in *Wiener*, Buroker's declaration provides the facts and reasoning upon which his conclusion is based. He explains that each PDB contains the most sensitive and important intelligence information available to the CIA

---

[2]Because we hold that the PDBs are protected under exemption 3, we do not decide whether the CIA's claims that they are also protected under exemption 1 and exemption 5 are valid. *See Minier*, 88 F.3d at 800 n.5; *Hunt*, 981 F.2d at 1118.

on the day it is released and that the requested PDBs specifically identify intelligence sources and methods. He also explains how PDBs convey important contextual information that could reveal sources or methods even if the PDBs were produced in redacted form. Because they are released on a daily basis and typically contain only the most current information fresh from the field, PDBs reveal when particular intelligence information became available to the CIA. This is important, as Buroker observes, because sophisticated foreign intelligence services might use that information to "reliably infer that a human source for information contained in the PDB is most likely one of a very few number of individuals with access to the subject information, and that the source must have provided the information very close in time to when it was reported in the PDB." An educated observer could also determine other sensitive information, such as what intelligence was most important to the President and to senior officials within the CIA at a particular time. *See Sims*, 471 U.S. at 176-77 ("A foreign government can learn a great deal about the Agency's activities by knowing the . . . sources of information that interest the Agency."). Furthermore, Buroker explains, the release of PDBs would diminish the CIA's ability to assure current intelligence sources that their identities will be kept secret in the future.

[6] Finally, in addition to the Buroker affidavit, Berman has access to several other Johnson PDBs that undisputedly contain a similar form and content to the ones he requests. He also has access to volumes of other information regarding intelligence and foreign policy during the Johnson administration, including National Security Files available through the Johnson Presidential Library. Access to these documents has enabled him specifically to contest the CIA's claim that the PDBs would divulge protected sources and methods. Berman therefore has sufficient facts at his disposal for the adversary process to function properly and thus he has been given "a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withhold-

ing." *Weiner*, 943 F.3d at 977 (citation and internal quotation marks omitted). Because of the broad deference we are to give the CIA under *Sims*, and because judges are poorly positioned to evaluate the sufficiency of the CIA's intelligence claims, *see Sims*, 471 U.S. at 176, 178, we doubt that the CIA's provision of a more detailed declaration would enable Berman to argue more effectively for their release. *See Weiner*, 943 F.2d at 983 (stating that the CIA affidavit was sufficient with regard to one withholding because "[n]o further disclosure would have enabled Weiner to argue for their release").

[7] Berman argues nonetheless that the CIA should be required to provide even greater detail regarding the content of the requested PDBs and how that content is tied to the harms the CIA fears. We are satisfied, however, that the Buroker declaration strikes the appropriate balance between justifying the applicability of the exemption with sufficient specificity to permit Berman meaningfully to challenge it and the CIA's need to avoid providing a description that is so specific that it risks revealing protected sources and methods. As *Sims* observed, "[i]t is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency." 471 U.S. at 179; *see also Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 742 (9th Cir. 1979) (stating that in asserting a FOIA exemption "the government need not specify its objections in such detail as to compromise the secrecy of the information"). We were mindful of this concern in *Hunt*, where we permitted the CIA to respond to a FOIA request by providing a so-called "*Glomar* response" in which the CIA refused to confirm or deny the existence of records pertaining to a foreign national. 981 F.2d at 1117. We did not require the CIA to identify particular harms that would occur if the documents were disclosed. Instead, we were satisfied with the CIA's statements that a more specific response might allow foreign intelligence agents to "determine the contours and gaps of CIA intelligence operations and make informed

judgments as to the identities of probable sources and targets in other countries," and that disclosure might prove to be a disincentive to future sources providing assistance the CIA. *Id.* at 1119. We cited with approval *Gardels v. CIA*, 689 F.2d 1100 (D.C. Cir. 1982), in which the CIA justified a *Glomar* response by averring that disclosure might allow foreign operatives to discover the identities of covert CIA sources and the CIA research interests. *Hunt*, 981 F.2d at 1119-20 (citing *Gardels*, 689 F.2d at 1103-04). It was therefore unnecessary for the affidavits in that case to "mention harms to particular individuals." *Id.* The CIA's declarations here are comparable in specificity to those in *Hunt* and *Gardels*. We therefore hold that they are sufficient.[3]

[8] Berman next argues that Buroker's declarations are insufficient because Buroker states only that disclosure of the PDBs "could" reveal sources and methods, rather than stating definitively that the PDBs *would* divulge such protected matter. But Buroker's declaration speaks in more certain terms than Berman suggests, in stating that the disclosure of the requested PDBs "*would* disclose specific intelligence methods, including technical collection methods," that disclosure "*would* tend to reveal the identities of intelligence sources," and that "[e]ach of the Requested PDBs contains information specifically stating sensitive sources or methods of collection." (Emphases added). More fundamentally, the CIA Director need not demonstrate to a certainty that disclosure will result in intelligence sources or methods being revealed. Instead, the NSA entrusts the Director with the discretion to determine that documents should remain secret because the

---

[3]In arguing that the CIA is required to disclose even more details regarding the contents of the requested PDBs, Berman cites precedent from this court and elsewhere regarding the appropriate standard where exemption 1 is at issue and where the CIA is not involved. But given the especially broad deference that we must accord the CIA under *Sims*, standards established under exemption 1 cannot be uncritically imported into the exemption 3 context. *See Fitzgibbon v. CIA*, 911 F.2d 755, 764 (D.C. Cir. 1990).

substantial risk that sources and methods will be compromised outweighs the public interest in disclosure. In *Sims*, the Supreme Court deferred to the CIA's conclusion that disclosure of the requested information "posed an unacceptable risk of revealing protected 'intelligence sources.' " 471 U.S. at 179; *see also Wolf*, 473 F.3d at 377 ("[I]nformation is exempt under [the NSA] if the Agency demonstrates that an answer to the query can *reasonably be expected* to lead to unauthorized disclosure." (emphasis added) (citation and quotation marks omitted)). We must therefore defer to the CIA's determination that disclosure would run the unacceptable risk that sources or methods would be revealed. Buroker has asserted that such risks are present here, not only with regard to revelation of sources and methods, but also in his warning that disclosure "reasonably could be expected to cause exceptionally grave damage to the national security of the United States." Because the CIA is better situated to gauge the national security implications of disclosure, *see Sims*, 471 U.S. at 179, we defer to its judgment.

[9] Berman also objects to the CIA's reliance on the "mosaic theory," which Buroker explains as the concept that "[w]hile some information in specific PDBs may appear harmless to disclose when read in isolation, such information may be very valuable as part of a 'mosaic' of information gleaned from various sources, including multiple PDBs prepared over time." The Supreme Court endorsed the mosaic theory in *Sims*, commenting that

> [B]its and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself. Thus, [what] may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context. Accordingly, the Director, in exercising his authority under [the NSA], has the power to withhold superficially innoc-

> uous information on the ground that it might enable
> an observer to discover the identity of an intelligence
> source.

471 U.S. at 178 (citations and internal quotation marks omitted; second alteration in original). We permitted the CIA to rely upon the mosaic theory in *Hunt*, when we accepted the CIA's argument that "disclosure . . . must not be viewed in isolation but rather as one tile in a mosaic of intelligence gathering." 981 F.2d at 1119; *accord Fitzgibbon*, 911 F.2d at 763; *see also Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998) (endorsing the mosaic theory in context of the government's assertion of the state secrets privilege against civil discovery requests). To be sure, the CIA's invocation of the mosaic theory does not excuse it from meeting its burden of proof or from its obligation to provide a reasonably specific explanation of why the exemption applies. But nothing prevents the CIA from relying on the common sense premise that the impact of disclosing protected documents must be evaluated not only based upon the information appearing within the four corners of the document, but also with regard to what secrets the document could divulge when viewed in light of other information available to interested observers.

We are to consider the sufficiency of the CIA's declarations in light of contrary evidence adduced by Berman. *See Hunt*, 981 F.2d at 1119. Berman relies upon the several PDBs that have been publicly disclosed to argue that there is nothing about PDBs generally that necessitates secrecy and thus the CIA was required to provide more detail regarding the PDBs requested in this case. Buroker's declaration explains, however, that each additionally disclosed PDB would provide more clues regarding intelligence sources and methods, as well as the ongoing dialogue between the President and the CIA. If multiple PDBs within a short time period were available, then an informed observer would be able to trace precisely when new information became available and, in the case of multiple entries on the same country, what types of

sources were employed. The CIA's explanations are entitled to deference and, in light of the overall showing made in Buroker's declarations, provide a sufficient factual basis for the district court's decision. *Cf. Sims*, 471 U.S. at 180-81 (rejecting the argument that the CIA was "somehow estopped" from withholding the identities of some intelligence sources because it had already disclosed others).

Berman also contends that much of the information contained in PDBs is similar if not identical to information set forth in publicly available Central Intelligence Bulletins (CIBs). Like PDBs, CIBs are brief summaries of intelligence information distributed to senior members of the executive branch. Buroker explains, however, that unlike PDBs, CIBs are not developed exclusively for the President; they are circulated throughout the government, including to policy, security and military officials. CIBs do not contain raw intelligence or direct source information and are written at a greater level of generality than PDBs The distinction drawn by Buroker is supported by the record. Although the CIBs in some cases contain similar text to contemporaneous PDBs, the majority of the information presented in the publicly available PDBs does not overlap with the same-day CIBs. Even if we assume that all the information in a particular PDB eventually makes its way into the CIBs — an assumption the record does not support — revelation of the PDBs would still divulge *when* that information became available and therefore potentially signal what sources or methods were in play. It might also reveal what information was of primary interest to the President at a given time. *See Sims*, 471 U.S. at 178 ("Foreign intelligence services have an interest in knowing what is being studied and researched by our agencies dealing with national security . . . .").

**[10]** Accordingly, we hold that the Buroker affidavits and other evidence in the record provided an adequate factual basis for the district court's decision. The CIA did not need to provide a more specific declaration.

## C.

**[11]** Because Buroker has stated explicitly that the requested PDBs would reveal protected sources and methods if disclosed, and because his declarations adequately support that assertion, exemption 3 applies. If Berman were seeking more recent PDBs there would be little room for dispute that they would reveal highly sensitive intelligence sources and methods. Berman's request therefore relies heavily upon the assumption that the passage of time — around 40 years — has eroded any support for the assertion that the PDBs contain information about sources or methods that has not already been revealed.

Buroker explains, however, that the passage of time has not vitiated the CIA's interest in maintaining the secrecy of the requested PDBs. In this regard, some of Buroker's explanations are little more than truisms — for example, that "[i]ndividual people may have long lives and careers, and foreign governments and intelligence services may exist in perpetuity" — without any indication that these particular PDBs involve sources who could be threatened by disclosure at this late date, or who could not be protected by redactions. If a source were threatened, the CIA's concerns would be quite compelling, but we cannot discern that from such generalizations.

**[12]** Nonetheless, Buroker does raise a related concern that the revelation of sources that are even 40 years old could hinder the CIA's current efforts to recruit individuals or governments as sources. Such potential sources may be frightened off if they believe promises of confidentiality are subject to an implicit time-based sunset clause at the discretion of the judiciary. Courts have permitted the CIA to maintain the secrecy of similarly dated material based on this concern. In *Sims*, for example, the Supreme Court held that exemption 3 applied to information that was about 20 to 30 years old. *See Sims*, 471 U.S. at 161. In so holding, the Court cited the necessity that

the CIA be able to give potential sources "an assurance of confidentiality that is as absolute as possible." *Id.* at 175. The Court explained that "[e]ven a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to 'close up like a clam.' " *Id.* The CIA therefore has a "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Id.* (citation and internal quotation marks omitted). Following *Sims*' instructions, other courts have permitted the CIA to maintain the secrecy of fairly old documents. *See Maynard v. CIA*, 986 F.2d 547, 555 n.6 (1st Cir. 1993) ("[T]he passage of thirty years, by itself, is insufficient to require [the CIA] to disclose the information."); *Fitzgibbon*, 911 F.2d at 763-74. The CIA's assertion that disclosure of old sources would detrimentally affect its ability to enlist new sources is entitled to deference, *see Sims*, 471 U.S. at 179, and warrants application of exemption 3 here.[4]

[13] Accordingly, we hold that the requested PDBs are protected from disclosure by exemption 3. Critical to our analysis — both with regard to the adequacy of the declarations and the applicability of the exemption — is the uniqueness of the PDBs as potentially the most important and classified intelligence document in this nation's intelligence apparatus. As Buroker summarizes, "the PDB is the most highly selective compendium of the most important intelligence available to the U.S. Intelligence Community." One observer has commented more succinctly that the PDB is "the most restricted

---

[4]This does not necessarily mean, as Berman suggests, that the CIA may use this rationale to keep documents secret in perpetuity. Although our broad deference to the CIA requires us to accept its assertion here, it is far less plausible that current sources would "close up like a clam" if they knew that their involvement with the CIA would be revealed four or five generations later. At the very least, the CIA would need to provide a better explanation of why documents of that vintage would need to remain secret.

document in Washington." Bob Woodward, *Bush at War* 132 (2002). The extreme sensitivity of the PDB enhances the plausibility of the CIA's assertion that disclosure of the requested PDBs could cause harm even 40 years after their generation. It also justifies Buroker's failure to describe in more detailed terms the relationship between the requested PDBs and protected sources and methods. We do not suggest that PDBs are categorically exempt from FOIA. But we are satisfied that Buroker's affidavit, when taken as a whole and viewed in light of other evidence in the record, justifies the application of exemption 3.

### D.

As an alternative to his assertion that disclosure of the contents of the requested PDBs would reveal protected sources or methods, Buroker submits that PDBs are *themselves* protected intelligence methods. This is true, Buroker states, because "[t]he PDB is part of the process by which the CIA advises the President and his most senior advisors regarding the subject areas most important to them" and therefore intelligence decisions "are directly affected by the PDB process." Notwithstanding the great deference we typically afford the CIA's affidavits, we reject Buroker's attempt to create a per se status exemption for PDBs.

**[14]** Although PDBs will typically contain information that reveals intelligence sources and methods, this does not mean that PDBs *themselves* are intelligence methods. As can be gleaned from the PDBs that are publicly available, PDBs are nothing more than simple memoranda the CIA uses to communicate with the President. Historians have documented the PDB process in such great detail that even if that process could be deemed a "method," that method has already been fully disclosed to the public. If we were to accept the CIA's logic, then every written CIA communication — regardless of content — would be a protected "intelligence method" because it is a method that CIA uses in doing its work. The

CIA would then be able to avoid entirely our requirement that it provide a specific justification that explains why the particular document requested fits within exemption 3. *See Hunt*, 981 F.2d at 1119. We decline to adopt such a boundless definition, and instead hold that whether or not a particular document used by the CIA in its ordinary course of business is an intelligence method depends upon the content of the document.

[15] The CIA cites *Aftergood v. CIA*, 355 F. Supp. 2d 557, 562 (D.D.C. 2005), as supporting its expansive definition of intelligence methods. In that case the district court held that exemption 3 excused the CIA from disclosing its budget. The court did not, however, hold that the budget itself is an intelligence method, but rather that "intelligence budget information *relates to* intelligence methods, namely the allocation, transfer and funding of intelligence programs." *Id.* (emphasis added) (citation and internal quotation marks omitted). There, as here, it was the content of the documents sought, not the documents themselves, that deserved protection under exemption 3.[5]

### IV.

We hold that exemption 3 excuses the CIA from release of these requested PDBs. We reject, however, the CIA's argument that the PDBs are themselves protected intelligence methods.

**AFFIRMED.**

---

[5]Berman argues that if we reject the CIA's claim that the PDBs are themselves intelligence methods, we must also reject the CIA's claim that disclosure of the PDBs would reveal intelligence methods because the second argument is inextricably intertwined with the first. Buroker's declaration specifically warns, however, that the requested PDBs "would disclose specific intelligence methods, including technical *collection* methods." (Emphasis added.) Buroker's prediction that intelligence methods would be disclosed is not grounded in the premise that PDBs are themselves methods.