**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NAJI JAWDAT HAMDAN; HOSSAM
HEMDAN; ACLU FOUNDATION OF
SOUTHERN CALIFORNIA,
*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF
JUSTICE; FEDERAL BUREAU OF
INVESTIGATION, a component of the
U.S. Department of Justice; U.S.
NATIONAL CENTRAL BUREAU-
INTERPOL, a component of the U.S.
Department of Justice; NATIONAL
SECURITY DIVISION, a component of
the U.S. Department of Justice;
DEPARTMENT OF STATE; UNITED
STATES CENTRAL INTELLIGENCE
AGENCY; UNITED STATES
DEPARTMENT OF DEFENSE; DEFENSE
INTELLIGENCE AGENCY, a
component of the U.S. Department
of Defense; DEFENSE OFFICE OF
FREEDOM OF INFORMATION, a
component of the U.S. Department
of Defense; BUREAU OF CUSTOMS &
BORDER PROTECTION, a component
of the U.S. Department of Homeland
Security; TRANSPORTATION

No. 13-55172

D.C. No.
2:10-cv-06149-
DSF-JEM

OPINION

SECURITY ADMINISTRATION, a
component of the U.S. Department
of Homeland Security; OFFICE OF
DIRECTOR OF NATIONAL
INTELLIGENCE; U.S. DEPARTMENT
OF HOMELAND SECURITY;
IMMIGRATION AND CUSTOMS
ENFORCEMENT, a component of the
U.S. Department of Homeland
Security; OFFICE OF INTELLIGENCE
AND ANALYSIS, a component of the
U.S. Department of Homeland
Security,
            *Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
March 2, 2015—Pasadena California

Filed August 14, 2015

Before: Ronald M. Gould and Richard C. Tallman, Circuit
Judges, and Edward R. Korman, Senior District Judge.[*]

Opinion by Judge Gould

---

[*] The Honorable Edward R. Korman, Senior District Judge for the U.S.
District Court for the Eastern District of New York, sitting by designation.

# SUMMARY[**]

## Freedom of Information Act

The panel affirmed in part, and vacated and remanded in part, the district court's summary judgment in favor of several federal agencies in plaintiffs' suit under the Freedom of Information Act ("FOIA"), arising from their request for information from a myriad of federal agencies about federal investigations related to Naji Hamdan and any U.S. role in his detention and torture by United Arab Emirates.

The panel affirmed the district court's rulings as to the adequacy of the agencies' search and the application of FOIA exemptions. The panel held that the State Department and the Federal Bureau of Investigation complied with their obligations to search for records under FOIA. The panel also held that the government properly withheld records under FOIA Exemption 1 (which protects national security information), Exemption 3 (which protects records exempt from disclosure pursuant to a separate statute); and Exemption 7(E) (which protects some records compiled for law enforcement purposes). Specifically, the panel affirmed the district court's holding that the Defense Intelligence Agency properly withheld records under Exemption 3 because those records were protected under 10 U.S.C. § 424.

FOIA provides that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

this subsection." 5 U.S.C. § 552(b). The panel held that the district court erred by not making findings on the issue of segregability. As to all the records whose existence was not itself classified, the panel directed the district court to determine on remand whether there was any content that could be segregated from the exempt information and turned over to plaintiffs.

## COUNSEL

Ahilan T. Arulanantham and Michael Kaufman, ACLU Foundation of Southern California, Los Angeles, California; Laboni A. Hoq (argued), Zulaikha Aziz, and Nicole Gon Ochi, Asian Americans Advancing Justice–Los Angeles, Los Angeles, California, for Plaintiffs-Appellants.

Stuart F. Delery, Assistant Attorney General, Matthew M. Collette and H. Thomas Byron III (argued), Attorneys, Civil Division, Appellate Staff, United States Department of Justice, Washington, D.C.; André Birotte, Jr., United States Attorney, Los Angeles, California, for Defendants-Appellees.

**OPINION**

GOULD, Circuit Judge:

Naji Hamdan, Hossam Hemdan, and the ACLU Foundation of Southern California (collectively, "Plaintiffs") appeal the district court's grant of summary judgment to several federal agencies in Plaintiffs' suit under the Freedom of Information Act ("FOIA"). Plaintiffs contend that: (1) two agencies did not conduct adequate searches for records responsive to Plaintiffs' FOIA request; (2) two agencies improperly invoked several exemptions to FOIA's disclosure requirements; and (3) the district court erred in not making findings of fact about whether there was non-exempt information in the withheld records that could be segregated and disclosed. We have jurisdiction under 28 U.S.C. § 1291. Because the Federal Bureau of Investigation ("FBI") and the State Department conducted searches reasonably calculated to produce records responsive to Plaintiffs' request, and because the FBI and the Defense Intelligence Agency ("DIA") properly withheld some records under several exemptions to FOIA's disclosure requirements, we affirm the district court's rulings on the adequacy of the agencies' searches or the invocation of the challenged exemptions. But because the district court did not make any findings as to whether there was non-exempt information in the withheld records that could reasonably be segregated and disclosed, and we cannot say on this record that the error was harmless, we vacate the grant of summary judgment and remand this case to the district court for a segregability analysis.

# I

Hamdan, a U.S. citizen born in Lebanon, moved to the United States in 1984, moved to the United Arab Emirates ("U.A.E.") in 2006, and in 2009 was deported from the U.A.E. to Lebanon, where he now lives.[1]  While in the United States, Hamdan owned an auto-parts business, Hapimotors. Hamdan was a founding member and sometime-volunteer imam at the Islamic Center of Hawthorne, a mosque in Hawthorne, California.  Hemdan, Hamdan's brother, is also a U.S. citizen and has lived in the United States since 1987. Hemdan now owns Hapimotors.

Since 1999, the FBI has questioned the brothers several times, asking whether either was involved with terrorism and about members of the mosque Hamdan attended.  Other friends, relatives, and business associates were also questioned, including Jehad Suliman, then the manager of Hapimotors.

In 2006, Hamdan moved with his wife and children to the U.A.E., where he started a new business.  On a brief visit to the United States several months later, Hamdan was questioned by federal agents for several hours after he arrived, and thought that he was followed by federal agents throughout his trip.  In 2007, Hamdan's wife and children moved to Lebanon.  In July 2008, Hamdan met with three FBI agents—two from California and one from the FBI's Legal Attaché Office in the U.A.E.—at the U.S. Embassy in Abu Dhabi to discuss an incident in January 2008 when

---

[1] Unless otherwise noted, the facts are drawn from evidence submitted by the parties in litigating the summary judgment motion, and Plaintiffs' version of events is credited wherever there is a factual dispute.

Hamdan had been detained and abused by Lebanese intelligence officials while visiting his family in Lebanon.

A month after that meeting, on August 26, 2008, Hamdan was detained by the U.A.E. State Security service without explanation. He was held in a secret location for three months and tortured to extract false confessions of involvement with terrorist activity. While in the secret facility, Hamdan was approached by an English-speaker with an American accent, whose shoes and pants, which Hamdan could see under his blindfold, appeared Western. The man warned Hamdan to cooperate with the State Security or he would be harmed. On October 19, 2008, Hamdan was visited by a U.S. consular official, to whom Hamdan was too afraid to speak about his torture because there were State Security officials present.

On August 28, 2008, days after Hamdan was detained, his wife informed the U.S. Consulate in Dubai, and Hemdan contacted the FBI in Los Angeles. But the consular visit mentioned above did not occur until mid-October. Unsatisfied with what they perceived as an insufficient response, in November 2008, Hamdan's family filed a habeas corpus petition in the U.S. District Court for the District of Columbia, contending that the U.S. government was complicit in Hamdan's detention. Hamdan was released from detention a week after the petition was filed, and transferred to a regular prison for criminal suspects. Hamdan was convicted of terrorism-related offenses by an Emerati court. He was sentenced to time served and deported to Lebanon.

In July 2010, Plaintiffs filed a FOIA request seeking information from a myriad of federal agencies about federal investigations related to Hamdan and any U.S. role in his

detention and torture by U.A.E. officials. They asked for "*any* records . . . *relating to or concerning*" Hamdan, Hemdan, Jehad Suliman, or Hapimotors, that were "prepared, received, transmitted, collected and/or maintained" by the Departments of Justice, State, Defense, and Homeland Security, and the Central Intelligence Agency "and *any* of their sub-agencies or divisions."

In August 2010, Plaintiffs filed a FOIA complaint in the district court. The State Department searched the record systems of eleven internal offices or components, as well as the U.S. Embassies in Abu Dhabi and Beirut and the U.S. Consulate General in Dubai. The State Department did not search the records of its Bureau of Political-Military Affairs. The Bureau is the State Department's main link to the Defense Department, and provides "policy direction in the areas of international security, . . . [and] military operations" and "has the Departmental lead on . . . defense relations, . . . and analyzing broad trends in international security affairs to determine their effect on U.S. policies." In response to the FOIA request and to the suit, the State Department identified 1177 responsive records, releasing 533 documents in full and 258 in part, and withholding 386 documents in full, before later identifying additional documents. Of the documents released, one email mentioned communication between a consular officer who visited Hamdan in detention and "Abu Dhabi Pol/Mil," and another email sent to the consular officer suggested that he "ask POL Mail [sic] (they are UAE State Security counterpart) to assist" in getting consular access to Hamdan while he was detained in the U.A.E. But the State Department's affidavit explaining its FOIA response said that no search was made of the Bureau's records because despite those mentions of an Abu Dhabi-based official, there appears to be no indication that the Bureau was involved in matters

related to Hamdan and no indication of a connection between Plaintiffs and the military functions performed by the Bureau.

The FBI searched its Central Records System ("CRS"), which is an archive of its "administrative, applicant, criminal, personnel and other files compiled for law enforcement purposes," but which the FBI also uses for responding to FOIA requests. The search was done using the Automated Case Support System, an index system which enables searches. According to the FBI's declarations justifying its searches and exemptions filed in the district court, the "decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent . . . assigned to work on the investigation, the Supervisory [Special Agent] in the field office conducting the investigation, and the SSA at" FBI headquarters. "The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval." The FBI also searched its Electronic Surveillance ("ELSUR") indices, which maintain information on communications intercepted by FBI surveillance.

The FBI searches identified 771 pages of responsive records, of which 521 pages were disclosed in full or in part, and 250 pages were withheld in full. The withholdings were justified under FOIA Exemptions 1, 2, 5, 6, 7(C), 7(D), and 7(E) to FOIA's disclosure requirements.[2] The DIA's search (the adequacy of which Plaintiffs do not challenge), identified

---

[2] Of the exemptions claimed by the FBI, Plaintiffs appeal only the applicability of Exemptions 1 and 7(E).

twenty-seven responsive records, but all were withheld under Exemptions 1, 2, 3, and 6.[3]

The district court granted summary judgment to the agencies. The district court held that the government's searches were adequate, and specifically that it was reasonable for the State Department not to search the Bureau of Political-Military Affairs records because there was no reason to think Hamdan, his family, or his business associates were involved in any of the military activities within the Bureau's purview. The district court also held that the FBI and the DIA had properly withheld records under Exemption 1 for classified material, because the classification claims were sufficiently supported by the declarations and there was no reason to doubt the truth or good faith of those declarations. Further, the court held that the DIA properly withheld documents under Exemption 3 "because 10 U.S.C. § 424 prevents the disclosure of DIA activities and organization," and that the FBI had justifiably withheld records under Exemption 7(E). Plaintiffs timely appealed.

## II

We review summary judgment orders in FOIA cases in a two-step process. *Berman v. CIA*, 501 F.3d 1136, 1139 (9th Cir. 2007). First, we review *de novo* whether the documents submitted by the agencies give an adequate factual basis for the district court's decision. *Id.* If there is an adequate factual basis, we then determine "whether the district court's decision regarding [the] applicability of FOIA's exemptions was correct." *Id.* Factual findings are reviewed for clear error, but legal conclusions, including whether a document

---

[3] Only DIA's invocations of Exemptions 1 and 3 are before us.

fits within one of FOIA's exemptions, are reviewed *de novo*. *Id.*

We review "whether [an agency's] indices and supporting declarations constitute a sufficient *Vaughn* index[4] *de novo*." *Citizens Comm'n on Human Rights v. FDA*, 45 F.3d 1325, 1328 (9th Cir. 1995).

Where the government invokes FOIA exemptions in cases involving national security issues, we are "required to accord 'substantial weight' to [the agency's] affidavits." *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992) (quoting *Miller v. Casey*, 730 F.2d 773, 776, 778 (D.C. Cir. 1984)). Those affidavits "must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Id.*

---

[4] A "*Vaughn* index" is a document supplied by government agencies to opposing parties and the court that identifies "each document withheld, the statutory exemption claimed, and a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption," and the index is designed to provide reasoning against which the requester can offer effective advocacy and a basis for the court to reach a reasoned decision. *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991). "There is no fixed rule establishing what a *Vaughn* index must look like, and a district court has considerable latitude to determine its requisite form and detail in a particular case." *ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013). The term derives from the D.C. Circuit's decision in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

## III

Government transparency is critical to maintaining a functional democratic polity, where the people have the information needed to check public corruption, hold government leaders accountable, and elect leaders who will carry out their preferred policies. Consequently, "FOIA was enacted to facilitate public access to [g]overnment documents" by "establish[ing] a judicially enforceable right to secure [government] information from possibly unwilling official hands." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (internal quotation marks omitted). FOIA recognizes that "an informed citizenry [is] vital to the functioning of a democratic society." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 16 (2001) (internal quotations omitted). In response to a FOIA request, government agencies must conduct a reasonable search to find any documents responsive to the request. *Lahr*, 569 F.3d at 986. But "FOIA contemplates that some information may legitimately be kept from the public" if it falls into one of nine enumerated exemptions in the statute. *Id.* at 973.

Government agencies may not rely merely on a need for heightened national security to justify erosion of statutory entitlements to information, because we will hold agencies to FOIA's requirements. Our decision today relates to intelligence and law enforcement records. Affidavits such as those submitted by the agencies here may not be sufficient in other contexts to satisfy the requirements of reasonable specificity in explaining why the contents of certain records cannot be disclosed. We will not, in cases raising issues of national security, abdicate our role to ensure that Congress's commands in FOIA are followed. But when dealing with properly classified information in the national security

context, we are mindful of our limited institutional expertise on intelligence matters, as compared with the executive branch. And we are also aware that it is in the nature of intelligence data that disclosure of small pieces of a puzzle may be aggregated and considered in context by an adversary, giving some risk even to explication of grounds for withholding documents.

In this case, the State Department and the FBI met their obligations to conduct an adequate search for responsive records and the FBI and the DIA demonstrated that the information they withheld from Plaintiffs fell within the statutorily enumerated exemptions. But the district court must determine whether there is any information in the withheld records that can reasonably be separated from the properly withheld information and disclosed to Plaintiffs.

   A. *The FBI's and State Department's searches were adequate.*

Plaintiffs argue that the FBI's and the State Department's searches for responsive records were not adequate. We disagree and affirm the district court's ruling on the adequacy of the searches.

"FOIA requires an agency responding to a request to 'demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents.'" *Id.* at 986 (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). An agency can demonstrate the adequacy of its search through "reasonably detailed, nonconclusory affidavits submitted in good faith." *Zemansky*, 767 F.2d at 571. Affidavits submitted by an agency to demonstrate the adequacy of its response are presumed to be in good faith.

*Grand Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). In evaluating the adequacy of the search, the issue "is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Lahr*, 569 F.3d at 987. "[T]he failure to produce or identify a few isolated documents cannot by itself prove the searches inadequate." *Id.* at 988.

Though *Lahr* made clear that a search is not inadequate for failure to turn up a single document, *see id.* at 987 (citing *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)), it may be the case that "if a review of the record raises substantial doubt, particularly in view of well-defined requests and positive indications of overlooked materials, summary judgment is inappropriate," *Iturralde*, 315 F.3d at 314 (quotation omitted). But in a case we cited approvingly in *Lahr*, the Eighth Circuit rejected a FOIA requester's challenge that the State Department had conducted an inadequate search because the requester had repeatedly identified certain documents that were not located or released to him but were referenced in records that the State Department *did* release. *See Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1384–85 (8th Cir. 1985) ("The fact that a document once existed does not mean that it now exists . . . [and] the Department is not required . . . to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found.").

The State Department's search was reasonably calculated to uncover all records responsive to Plaintiffs' FOIA request. Even though the Department did not search the records of the Bureau of Political-Military Affairs, there is no reason to

doubt the good faith of the Department's declaration that there is no apparent connection between Hamdan and the military matters within the Bureau's purview. Plaintiffs point to the two emails the State Department's search revealed mentioning, respectively "Abu Dhabi Pol/Mil," and getting in touch with "Pol Mail [sic]" as the liaison to U.A.E. State Security. But first, these are exactly the sort of isolated records that *Lahr* says do not undermine the adequacy of a search. Second, the State Department did search the records of the U.S. Embassy in Abu Dhabi, which would likely have uncovered any communications with "Abu Dhabi Pol/Mil." More light may be shed on the role of "Abu Dhabi Pol/Mil" in the records that the State Department searched turned up but whose contents were withheld under FOIA's exemptions. Plaintiffs do not challenge the propriety of the State Department's withholding records.

We hold that the FBI's search was also reasonably calculated to locate responsive records. Plaintiffs contend that the FBI should have searched for records from the FBI's field offices in Los Angeles and Long Beach, California, the email files of specific FBI personnel, and the records of the FBI Legal Attaché in Abu Dhabi. The crux of their argument is the FBI did not conduct an adequate search because: (1) the FBI admits that the "decision to index names [in the CRS] other than subjects, suspects, and victims is a discretionary decision made by" FBI personnel; (2) the FBI admits that not every email sent by or to every agent will be preserved; and (3) the State Department searches located communications between FBI and State Department officials that the FBI's search did not identify. We disagree.

First, the FBI affidavits state that the CRS and ELSUR systems together constitute the means by which the FBI

maintains its records for use in investigations. The FBI's decision to search those databases, using many variations of the terms suggested by Plaintiffs to account for spelling or other inconsistencies, was a "diligent search for . . . documents in the places in which they might be expected to be found." *Miller*, 779 F.2d at 1385. Plaintiffs' suggestion that the FBI might be under-inclusive in uploading and indexing records in the CRS to avoid FOIA disclosures is unpersuasive. The CRS is used primarily as a law enforcement tool to provide FBI personnel with a comprehensive, searchable database for information to aid in their mission. An under-inclusive approach to indexing would undercut the CRS's investigative value.

Second, we reject Plaintiffs' reliance on *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28–29 (D.C. Cir. 1998), which held that the FBI's search of the CRS was insufficient if other databases are likely to turn up the information requested. In *Campbell*, the court explained that an agency has discretion to conduct a standard search in response to a general request, but must rethink its assessment of what is a "reasonable" search in light of leads that emerge from its initial search that suggest other records might be located elsewhere. *Campbell*, 164 F.3d at 28. But *Campbell* dealt with the FBI's failure to search its ELSUR database where records located by the CRS search alluded to potentially responsive ELSUR records. Here, the FBI did search its ELSUR records. Moreover, Plaintiffs have made no showing that by the close of the FBI's search, leads had emerged suggesting a need to search other databases. *Cf. id.* That records identified by the State Department's search months later indicated that a few documents may not have been located by the FBI is not enough for us to call the FBI's search unreasonable or inadequate.

Plaintiffs were entitled to a reasonable search for records, not a perfect one. And a reasonable search is what they got. The State Department and the FBI complied with their obligations to search for records under FOIA.

### B. *The government properly withheld records under FOIA Exemptions 1, 3, and 7(E).*

FOIA's strong presumption in favor of disclosure places the burden on the government to show that an exemption properly applies to the records it seeks to withhold. *Lahr*, 569 F.3d at 973. But we also give considerable deference to agency affidavits made in apparent good faith where the affadavits reasonably describe the justifications for nondisclosure and show that the content withheld falls within one of FOIA's exemptions. *See Hunt*, 981 F.2d at 1119. We conclude that the FBI and the DIA adequately justified their withholding of records under FOIA's exemptions.

After a careful and searching review of the record, we have no reason to doubt the agencies' good faith. Affidavits submitted by an agency to demonstrate the adequacy of its FOIA response are presumed to be in good faith. *Grand Saucer Watch*, 692 F.2d at 771. As the Supreme Court cautioned in a case involving FOIA, government misconduct is "easy to allege and hard to disprove, so courts must insist on a meaningful evidentiary showing." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 175 (2004) (internal quotation marks and citation omitted). Plaintiffs have made no such meaningful showing here, despite peppering their briefs with allegations of FBI involvement in Hamdan's abduction and torture by Emirati authorities, and suggestions that the agencies' withholdings in this case are calculated to cover up proxy detention practices that allegedly would allow

suspects to be detained and tortured by foreign governments. But there has been no evidence produced in this case to give us good reason to doubt the agencies' good faith. The State Department communications that were disclosed reveal that State Department personnel sought—and obtained—consular access to Hamdan while he was detained and advised the U.A.E. government that denying Hamdan consular access and the delay in consular notification was a violation of the U.A.E.'s treaty obligations. Plaintiffs's contentions seem based on coincidence and conjecture: the FBI questioned Hamdan in the U.A.E. several weeks before his detention, Hamdan was transferred to a regular detention facility from his secret location shortly after his family's habeas corpus petition was filed, and Hamdan was questioned by someone he thought was an American. But these facts do not prove, and they barely suggest, that the FBI was involved in Hamdan's detention. It is certainly not the meaningful evidentiary showing the Supreme Court says is needed to undermine the presumption of good faith.

1. The FBI and DIA properly withheld records under Exemption 1.

Exemption 1 protects national security information, and specifically exempts from disclosure records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

The records withheld under Exemption 1 in this case are classified under section 1.4 of Executive Order 13,526, which protects, among other things, "foreign government

information," "intelligence activities [and] intelligence sources or methods," and "foreign relations or foreign activities of the United States, including confidential sources." 75 Fed. Reg. 707, 709 (Dec. 29, 2009). The parties do not dispute the meaning of these phrases on appeal or that Executive Order 13,526 provides classification criteria for certain records. Rather, they dispute whether the FBI and the DIA affidavits are sufficiently detailed to show that each document withheld has been properly classified.

We held in *Wiener* that an agency must make an effort to tailor the explanation for classification to the specific document withheld. 943 F.2d at 979. In that case, a history professor sought records concerning the FBI's investigation of John Lennon, of Beatles fame, in the 1960s and 1970s. *Id.* at 976–77. To justify its Exemption 1 withholdings, the FBI used "boilerplate" explanations taken from a "'master' response filed by the FBI for many FOIA requests." *Id.* at 978. We concluded that the categorical approach to explaining why documents were withheld did not give the requester adequate opportunity "to argue for release of particular documents." *Id.* at 979. Unless the agency is as specific as possible without thwarting Exemption 1's purpose, "the adversarial process is unnecessarily compromised." *Id.*

But the Supreme Court, our court, and other circuits have emphasized the importance of deference to executive branch judgments about national security secrets, and that is what is before us here. In *Hunt*, we held that where affidavits give reasonably detailed justifications for withholding, and they appear to be in good faith, the inquiry ends and the nondisclosure is upheld. 981 F.2d at 1119; *see also CIA v. Sims*, 471 U.S. 159, 179 (1985) (noting that decisions of CIA director are given deference because of high stakes for

national security); *Wilner v. NSA*, 592 F.3d 60, 76 (2d Cir. 2009) (noting that courts should be deferential to executive predominance in FOIA cases involving national security); *Berman*, 501 F.3d at 1141–42 (observing that judges are not well-positioned to evaluate the sufficiency of CIA intelligence claims). Moreover, as the D.C. Circuit has explained, there is nothing suspicious about agencies using "the same or similar language in different affidavits supporting FOIA exemptions [because] when the potential harm to national security . . . is the same, it makes sense that the agency's stated reasons for nondisclosure will be the same." *Larson v. Dep't of State*, 565 F.3d 857, 868 (D.C. Cir. 2009). *Wiener* itself, in discussing the FBI's "boilerplate" assertions, emphasized the conditional language in the FBI's *Vaughn* index, which included passages such as:

> Information of this category is *either* specific in nature *or* of a unique character, and thereby could lead to the identification of a source. *For example*, this information *may* contain details obtained from a one-on-one conversation between a source and another individual. It *may* be of such detail that it pinpoints a critical time frame *or* reflects a special vantage point from which the source was reporting. The information *may* be more or less verbatim from a source's report and thus reveal a style of reporting peculiar to that source along with other clues as to authorship, such as handwritten *or* typewritten reports of the informant. The nature of the information *may* be such that only a handful of parties would have access to it. It is the degree of

> specificity of this information that endangers
> the source's continued anonymity . . . .

*Wiener*, 943 F.2d at 978 (emphasis added by the *Wiener* court). *Wiener* does not mean that an agency can never repeat language to justify withholding multiple records, but rather that in the context of *Wiener*, the FBI had not shown why the records at issue could not be opened up for public inspection.

"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)). Sitting en banc in *Mohamed v. Jeppesen Dataplan, Inc.*, we affirmed the dismissal of a civil suit under the state secrets doctrine. 614 F.3d 1070 (9th Cir. 2010) (en banc). Even the dissenters in that case acknowledged that in FOIA cases, where litigation is for the independent purpose of obtaining disclosure of classified information, "the balance of interests will more often tilt in favor of the Executive . . . . FOIA therefore predictably entails greater deference to . . . classification . . . ." *Id.* at 1096 n.9 (Hawkins, J., dissenting). Here, awareness of our limited expertise relative to the executive in national security matters leads us to conclude that both the FBI and the DIA properly invoked Exemption 1 to withhold records whose contents were properly classified.

In this case, the FBI's explanations of its Exemption 1 withholdings discussed the general justifications for shielding intelligence sources and methods and foreign government information from public disclosure. But the affidavits also explain the withholding of particular groups of documents. For example, the FBI explained that one document reflected

a particular vantage point from which the source of the intelligence might be identified, and that a group of documents—each one identified by number—contains detailed intelligence activities information gathered on a specific individual or organization and that disclosure would reveal the means used to gather the intelligence and the extent of the FBI's knowledge of a specific target during a specific period in time. This has none of the conditional language we found insufficient in *Wiener*, and we conclude that the FBI has fairly provided as much detail as it can without compromising the very secrets Exemption 1 is supposed to protect. *See Wiener*, 943 F.2d at 979.

The DIA's explanations are sparser and the question is closer. After explaining the justifications for nondisclosure of intelligence sources and methods generally in its affidavits, the DIA's *Vaughn* index used identical language for all but one entry, saying that disclosure "would reveal intelligence sources and methods and compromise the intelligence information collection mission effectiveness of the intelligence community." But the entry for one document withheld under Exemption 1 says that in addition to revealing intelligence sources and methods, the document contained foreign government information that if disclosed, would damage U.S. relations with that government. *See* Exec. Order 13,526, § 1.4(d), 75 Fed. Reg. at 709. This detail suggests that the same explanation was not repeated unthinkingly for each document, and that no other information could be revealed without revealing the very information Exemption 1 was designed to protect.

Plaintiffs argue that the DIA's affidavits are less detailed than the State Department's. But FOIA only requires reasonably specific justifications to enable a meaningful

adversarial process and review by the courts. The fact that the State Department can divulge more details justifying its withholdings than the DIA is unsurprising: the DIA's entire public mission is to provide intelligence collection and analysis for the Defense Department. That may require more secrecy for its records than many State Department documents need.

Similarly, Plaintiffs argue that *Wiener* demands more detail than what the DIA has offered here. We disagree. *Wiener* demands that the government disclose what it can without "thwarting the claimed exemption's purpose." 943 F.2d at 979 (alterations omitted). It is reasonable to say that the government can explain its reasons for withholding the records at issue in *Wiener*, relating to the government's investigation of John Lennon twenty years earlier, with more detail than the records at issue here, in a case that relates to current intelligence and law enforcement activity of the government, including sensitive issues that may involve possible cooperation with foreign governments.

"Minor details of intelligence information may reveal more information than their apparent insignificance suggests because, much like a piece of a jigsaw puzzle, [every detail] may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself." *Larson*, 565 F.3d at 864 (internal quotation marks and citation omitted). Because here "[i]t is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency," *Sims*, 471 U.S. at 179, we affirm the FBI's and the DIA's invocations of Exemption 1.

> 2. The DIA properly withheld records under Exemption 3.

Plaintiffs challenge the DIA's justification for withholding certain records under FOIA Exemption 3. We agree with the district court that the DIA has met its burden to justify withholding the content of certain records under Exemption 3.

Exemption 3 protects records exempt from disclosure pursuant to a separate statute. 5 U.S.C. § 552(b)(3). The district court held that the DIA had properly withheld records under Exemption 3 because those records were protected under 10 U.S.C. § 424.[5] Section 424 provides that no law shall be interpreted to require disclosure of "(1) the organization or any function of [the DIA]; or (2) the number of [DIA personnel] or the name, official title, occupational series, grade, or salary of any such person." *Id.*

There is a two-step inquiry in deciding Exemption 3 questions. We ask first whether the statute identified by the agency is a statute of exemption within the meaning of Exemption 3, and then whether the withheld records satisfy the criteria of the exemption statute. *See Sims*, 471 U.S. at 167. The answer to both inquiries is yes.

---

[5] We need not decide whether the DIA properly invoked the National Security Act of 1947 as an independent statutory basis for withholding under Exemption 3 because the DIA invokes that statute's protection of records that would reveal sources or methods of intelligence, which is coextensive with the analysis of the DIA's Exemption 1 argument above. But because of the need for the district court to undertake a segregability analysis on remand, we must decide whether the content that the DIA seeks to withhold as an agency "function" is covered by § 424.

The significance of § 424 for FOIA litigation is a question of first impression among federal circuit courts. In this case, the parties do not dispute that § 424 qualifies as a withholding statute within the meaning of Exemption 3. Moreover, the plain language of a statute stating that no law shall require disclosure of certain records indisputably satisfies the criteria of Exemption 3. *See Sack v. CIA*, 53 F. Supp. 3d 154, 174 n.17 (D.D.C. 2014) (holding that § 424 falls within the scope of Exemption 3); *Physicians for Human Rights v. U.S. Dep't of Defense*, 778 F. Supp. 2d 28, 36 (D.D.C. 2011) (same); *cf. Wilner*, 592 F.3d at 72 (holding that similarly worded provision related to the National Security Agency falls under Exemption 3).

As for the second step, the parties disagree about whether the DIA has shown that the content withheld falls under § 424. Plaintiffs do not dispute that the DIA's invoking § 424 was proper to shield phone numbers, names, and email accounts of DIA personnel, as well as web addresses on the DIA's classified network. But the DIA also withheld the names of the countries and intelligence organizations with which the DIA shares intelligence, claiming that it would reveal a "function" of the agency within the meaning of § 424.

We must interpret the word "function" in § 424. Plaintiffs contend that § 424 covers only information related to DIA organization and personnel, arguing that if "function" referred to all the tasks that the DIA performs, the latter provision protecting personnel information would be superfluous. That is not so. Rather, reading § 424 to shield only information about DIA personnel would effectively read the first prong out of the statute. Understanding "function" as referring to the DIA's mission, but not to records unrelated

to any DIA tasks would not make the prong shielding personnel information meaningless. For example, an aggrieved employee considering litigation about discriminatory or other inappropriate conduct might seek records of prior, similar conduct, which would not be exempt from disclosure under the first prong of § 424. While the DIA's actual human resources and discrimination policies might be "functions," records of, for example, inappropriate emails would not be, though the names and contact information of the DIA personnel involved could be withheld under § 424's second prong, giving meaning to the entire statute.

Plaintiffs cite *Baker v. CIA*, 580 F.2d 664, 669 (D.C. Cir. 1978), which interpreted a somewhat similar statute related to the CIA and held that the statute only exempted records related to CIA personnel from disclosure. But that statute shielded "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507 (formerly 50 U.S.C. § 403g). Section 424, by contrast, has separate provisions shielding, first, "the organization or any function" of the DIA, and second, information about DIA personnel. 10 U.S.C. § 424.

While it is publicly known that the DIA shares intelligence with foreign governments—a "function" at the highest level of generality—we conclude that the names of the governments with which the DIA shares intelligence falls within the category of properly withheld records under § 424. Otherwise, some governments might face severe political consequences from their constituents or allies due to cooperation with U.S. intelligence services, and the DIA's ability to gather intelligence would be compromised.

The DIA's *Vaughn* index is sufficiently detailed to justify its Exemption 3 withholdings. For each document that would identify the names of countries or agencies with which the DIA shares intelligence, the index explained as much. We cannot imagine what further detail the DIA could have provided without actually naming the country or the organization.

We affirm the district court's conclusion as to Exemption 3.

> 3. The FBI properly withheld records under Exemption 7(E).

Plaintiffs contend that the FBI did not adequately justify withholding certain records under Exemption 7(E). We disagree.

Exemption 7(E) protects records compiled for law enforcement purposes from disclosure if those records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). We have held that "Exemption 7(E) only exempts investigative techniques not generally known to the public." *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 815 (9th Cir. 1995). In *Rosenfeld*, we decided that a pretext phone call was a generally known law enforcement technique. *Id.* In that case, the government argued that the technique at issue involved the specific application of a pretext phone call, because it used "the identity of a particular individual, Mario Savio, as the pretext." *Id.* We rejected that argument,

reasoning that accepting it would allow anything to be withheld under Exemption 7(E) because any specific application of a known technique would be covered. *Id.*

Here, Plaintiffs challenge the complete withholding of five documents and the partial withholding of ten under Exemption 7(E). According to the FBI's affidavit, those records reveal "techniques and procedures related to surveillance and credit searches," and in one document, "a stratagem, the details of which if revealed would preclude its use in future cases." It is true that credit searches and surveillance are publicly known law enforcement techniques. But the affidavits say that the records reveal techniques that, if known, could enable criminals to educate themselves about law enforcement methods used to locate and apprehend persons. This implies a specific *means* of conducting surveillance and credit searches rather than an application. By contrast, withholding, for example, records under Exemption 7(E) by claiming that they reveal the satellite surveillance of a particular place would be an *application* of a known technique under *Rosenberg* (though that information might be protected by other exemptions). We conclude that the affidavits, which state that further detail would compromise the very techniques the government is trying to keep secret, are sufficient to satisfy the FBI's burden. *Cf. Bowen v. FDA*, 925 F.2d 1225, 1229 (9th Cir. 1991) (holding that additional details of law enforcement techniques were exempt from disclosure under 7(E) even where some information about those techniques had been previously disclosed).

Plaintiffs also contend that the FBI must show that disclosure would lead to a danger of future lawbreaking. The exemption protects information that "would disclose

techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Plaintiffs argue that the FBI must show that disclosure of its techniques would risk circumvention of the law for Exemption 7(E) to apply. But Plaintiffs' argument is an unpersuasive reading of the statutory text and structure. As the Second Circuit has explained:

> Beginning, as we must, with the plain meaning of the statute's text and structure, we see no ambiguity. The sentence structure of Exemption (b)(7)(E) indicates that the qualifying phrase ("if such disclosure could reasonably be expected to risk circumvention of the law") modifies only "guidelines" and not "techniques and procedures." This is because the two alternative clauses that make up Exemption 7(E) are separated by a comma, whereas the modifying condition at the end of the second clause is not separated from its reference by anything at all. Thus, basic rules of grammar and punctuation dictate that the qualifying phrase modifies only the immediately antecedent "guidelines" clause and not the more remote "techniques and procedures" clause.

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Security*, 626 F.3d 678, 681 (2d Cir. 2010) (citations omitted).

Finally, we reject Plaintiffs' contention that Exemption 7(E) does not apply because the FBI is seeking to conceal information about law enforcement techniques that are "illegal or of questionable legality." *Wilkinson v. FBI*, 633 F. Supp. 336, 349 (C.D. Cal. 1986). We need not address whether Exemption 7(E) is so limited because there is no indication that any of the techniques being protected from disclosure are of questionable legality. The techniques the FBI seeks to protect from disclosure relate to surveillance and credit searches, and Plaintiffs have made no showing of any unlawful uses of such techniques. Plaintiffs assert that Exemption 7(E) is being used to cover up the FBI's use of proxy detention, but as we discussed above, there has not been a sufficient showing of the FBI's bad faith and nothing in the affidavits suggests that information about proxy detention is in the records the FBI has withheld under Exemption 7(E).

We affirm the district court's ruling as to Exemption 7(E).

C. *The district court erred by not making findings on the issue of segregability.*

FOIA provides that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). We have held that "[i]t is reversible error for the district court 'to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof,' with respect to that document." *Wiener*, 943 F.2d at 988 (quoting *Church of Scientology v. U.S. Dep't of the Army*, 611 F. 2d 738, 744 (9th Cir. 1979)). *Wiener* reversed the district court and remanded with an instruction that the court "must make a

specific finding that no information contained in each document or substantial portion of a document withheld is segregable." *Id.* "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008). The agency can meet this burden by providing the district court with a reasonably detailed description of the withheld material and "alleging facts sufficient to establish an exemption." *Id.*

Here, we do not know whether the district court ensured that the agency met its burden to establish that all reasonably segregable material had been separated and disclosed. That is because the only mention of segregability in the district court's order was its statement in a footnote that it need not "undertake an independent segregability analysis on each document if the documents are withheld for attorney-client or work product privilege." That statement is insufficient to demonstrate that the district court considered segregability as it relates to the FOIA exemptions invoked below.

Because we have previously held that it is reversible error for the district court to approve the withholding of a document without a segregability finding, we now remand to the district court for such a finding. That said, we recognize that there is conflicting guidance within our circuit as to what constitutes a proper segregability analysis. *Compare Weiner*, 943 F.2d at 988 (holding that the district court must conduct a careful *de novo* review of the agency and remanding for the district court to make a specific finding for *each* document as to segregability), *with Pac. Fisheries*, 539 F.3d at 1150 (holding that a district court may rely on an agency declaration that is reasonably detailed and remanding for the

district court to make specific findings relating to segregability for *all* documents). It is not reasonable to interpret our precedent to require the district court to take on the role of document clerk, reviewing each and every document an agency withholds. A district court must take seriously its role as a check on agency discretion, but this does not require a page-by-page review of an agency's work.

The district court may rely on an agency's declaration in making its segregability determination. *Pac. Fisheries*, 539 F.3d at 1148. Agency affidavits that are sufficiently detailed are presumed to be made in good faith and may be taken at face value. *Hunt*, 981 F.2d at 1119. In short, a district court is not required to conduct an independent *in camera* review of each withholding unless an agency declaration lacks sufficient detail or bears some indicia of bad faith by the agency. Of course, for those records, if any, falling within a district court's rulings on an agency's *Glomar*[6] or § 552(c)[7] submissions, no segregability analysis would be necessary, because that would defeat the very purpose of those doctrines.

---

[6] The *Glomar* doctrine lets an agency refuse to confirm or deny whether certain records exist. This is "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request . . . [and is] permitted only when confirming or denying the existence of records would itself cause harm cognizable under [a] FOIA exception." *ACLU*, 710 F.3d at 426 (quoting *Wolf*, 473 F.3d at 374) (internal quotation marks omitted).

[7] 5 U.S.C. § 552(c) provides that FOIA does not apply in situations concerning certain law enforcement and intelligence activities where even whether certain records exist is classified.

Plaintiffs object to the withholdings by the State Department, FBI, and DIA for two reasons. First, Plaintiffs suggest that an agency must describe what proportion of each document is non-exempt material and how that material is dispersed throughout the document. Second, Plaintiffs suggest that withholding a document in full or using large block redactions is inappropriate. We disagree.

An agency must describe the document or information being withheld in sufficient detail to allow the plaintiffs and the court to determine whether the facts alleged establish the corresponding exemption. *Pac. Fisheries*, 539 F.3d at 1148. We have not held that the manner of that description must take any particular format, so long as it is sufficiently detailed. *See id.* In the interest of clarifying our circuit's segregability standard, we examine below whether and how each agency complied with its obligations to establish "that all reasonably segregable portions of [their documents] have been segregated and disclosed." *Id.*

The State Department's declarations are sufficiently detailed such that the district court could take them at face value. The declarations identify the withheld documents individually. They provide an individualized explanation of the material being withheld. They identify the corresponding exemption. And in some cases, they even note that the "withheld portions are so inextricably intertwined with the non-exempt portion, that any segregable material would not be meaningful." Moreover, there is ample evidence that the State Department has acted in good faith in its dealings with the district court and Plaintiffs, including re-reviewing materials for release at Plaintiffs' request and closely scrutinizing what it releases. For example, the State Department released a document to Plaintiffs in which there

was only one sentence that was not redacted.  Rather than withhold the entire document, the State Department took the correct view that it was required to release any information that was not classified, even if it was a single sentence.

Though the FBI's declarations are not as robust as the State Department's, they are still sufficiently detailed to enable the district court to take them at face value.  The declarations identify documents by number.  They provide specific reasons why the disclosure of information would be harmful.  And, the FBI specifically states that "[n]o reasonably segregable, nonexempt portions were withheld from plaintiffs."  This is supported by the partially redacted documents that the FBI produced.  These documents demonstrate that the FBI released large portions of previously classified material, redacting only the bare minimum of information.

In contrast, the DIA's declarations lack sufficient detail to allow the district court to determine that the claimed exemptions apply throughout all of the documents.[8]  The DIA provides little individualized information about the withheld documents.  The first eighteen documents in the DIA's *Vaughn* index vary in length from two to eight pages; some are classified Secret, some Top Secret.  But all are completely withheld for the same reason.  The DIA claims their release would "reveal intelligence sources and methods" without

---

[8] Our concern with the adequacy of the segregability issue does not undermine our previous holding, that the DIA properly withheld records under FOIA Exemptions 1 and 3.  *See supra* Sections III.B.1 and 2.  The DIA's declarations are sufficiently detailed for the determinations in Section III.B but simply lack the information necessary for a segregability determination.

providing any detail about whether or not the DIA considered releasing reasonably segregable information.  Nor does the DIA provide us with any evidence of its good faith.  All of the DIA's documents are completely withheld, so the district court did not have the opportunity to observe the DIA's approach to redaction.   Moreover, some of the DIA's declarations are self-contradictory.  In its initial declaration, the DIA identifies twenty-seven responsive documents that must be withheld in full because of "FOIA exemptions (b)(1), (b)(2), (b)(3), and (b)(6)."  Yet the attached *Vaughn* index never invokes FOIA exemption (b)(2). Without further detail from the DIA it is not possible for the district court to presume that the DIA's declarations are made in good faith.[9]

We vacate the grant of summary judgment solely on the issue of segregability.   As to all of the records whose existence is not itself classified, the district court should determine on remand whether there is any content that can be segregated from the exempt information and turned over to Plaintiffs.

**IV**

We affirm the district court's rulings as to the adequacy of the agencies' search and the application of the FOIA exemptions.   After a careful and searching review of the record, we are satisfied that the agencies made reasonable searches for responsive documents, that they gave reasonably specific   justifications   for   withholding   or   redacting documents, and that the agencies' claims of FOIA exemption,

---

[9] This detail may be provided in a variety of ways.  For example, the district court may request a supplemental declaration, a revised *Vaughn* index, or an *in camera* review of the documents.

apart from the issue of segregability, should be held valid, as the district court ruled. But we vacate the grant of summary judgment and remand for the district court to make findings as to segregability.

The parties shall bear their own costs.

**AFFIRMED in part, VACATED and REMANDED in part.**